No. 47,641

THOMAS P. PALMER, *Appellee,* v. JOHN W. BREYFOGLE, JR., JOHN J. GARDNER, PETER A. MARTIN, JOSEPH S. DAVIS, JR., HUGH H. KREAMER, EUGENE T. HACKLER, ROBERT C. LONDERHOLM, WILSON E. SPEER, JOSEPH N. VADER and RANDOLPH G. AUSTIN, and JOHN ANDERSON, JR., *Appellants.*

(535 P. 2d 955)

Opinion filed May 10, 1975.

*Peter A. Martin,* of Breyfogle, Gardner, Martin, Davis and Kreamer, of Olathe, argued the cause, and *Wilson E. Speer,* of Hackler, Londerholm, Speer, Vader and Austin, of Olathe, was with him on the brief for the appellants.

*John H. Fields,* of Carson, Fields, Kugler and Boal, of Kansas City, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by an attorney-at-law against other attorneys-at-law to recover one-third of an attorney fee awarded in a divorce case in the district court of Johnson

county. A determination of the case requires an interpretation and application of Disciplinary Rule DR 2-107 of the Code of Professional Responsibility adopted by this court effective July 1, 1970. It provides in pertinent part as follows:

"DR 2-107 Division of Fees Among Lawyers.

"(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:

"(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

"(2) The division is made in proportion to the services performed and responsibility assumed by each.

"(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

"(B) . . ."

This is the first occasion where a controversy between attorneys over a division of an attorney fee requires this court to interpret DR 2-107 and to apply it to a specific factual situation.

The plaintiff-appellee, Thomas P. Palmer, has practiced law for many years in Wyandotte county. We will refer to him as the plaintiff or Palmer. The defendants-appellants are individual members of two Johnson county law firms. The original defendants in the case were John W. Breyfogle, John J. Gardner, Peter A. Martin, Joseph S. Davis, Jr., and Hugh H. Kreamer. We will refer to them as the Breyfogle law firm. In the course of the litigation Eugene T. Hackler, Robert C. Londerholm, Wilson E. Speer, Joseph N. Vader, and Randolph G. Austin were made additional party defendants. We will refer to them collectively as the Hackler firm. John Anderson, Jr., was also made a party defendant. He had previously been a member of the Hackler firm but withdrew therefrom and therefore filed a separate answer in the case.

The parties to the divorce case are not involved in this litigation. Under the circumstances we do not deem that it would be proper to reveal their identity or their private affairs in this opinion. Throughout the opinion we will refer to the plaintiff-wife in the divorce case as Wife. We will refer to the defendant-husband in the divorce case as Husband.

The claim set forth in the petition and amended petition filed in the case was based upon a claim by Palmer that he was entitled to a forwarding fee or referral fee of 33⅓ percent of the total attorney fees collected. Plaintiff relied upon the minimum fee schedules of the Johnson county and Wyandotte county bar associations.

They called for the payment of an attorney fee to local counsel without active participation by the forwarding counsel in the amount of 66⅔ percent of the fees collected, with a payment of fee to the forwarding attorney in the amount of 33⅓ percent. The amended petition alleged in substance that the plaintiff Palmer is an individual practicing lawyer in Kansas City, Kansas; that the defendants, Breyfogle firm and Hackler firm, are engaged in the practice of law in Olathe, Johnson county, and that the defendant, John Anderson, Jr., is engaged in the practice of law in Overland Park. The petition further alleged that on or about October 30, 1971, the plaintiff caused a divorce case for Wife to be forwarded to the Breyfogle firm for filing in Johnson county; that the case was filed and that a substantial fee was obtained. The total fee received was $90,000 less some expenses. The basis of plaintiff's claim is set forth in paragraph 5 of the amended petition:

"5. That the minimum fee schedule of the Johnson County and Wyandotte County, Kansas Bar Associations call for payment of attorneys fees to local counsel *without active participation by the forwarding counsel* of 66⅔% of the fee collected. That the balance of said fee is to be paid to the forwarding attorney in such cases. That in compliance with the minimum fee schedule and established custom and practice, the plaintiff did forward said case as aforesaid to the defendants, Breyfogle, Gardner, Martin, Davis and Kreamer." (Emphasis supplied.)

In paragraphs 6 and 7 of the amended petition the plaintiff alleged that he was entitled to an attorney fee in the amount of $30,000 which defendants had refused to pay. Plaintiff's prayer was for $30,000 and costs.

The Breyfogle firm filed an answer admitting the professional status and composition of the law firms involved, admitting the filing of the divorce case and that a substantial fee was earned, but denying the other allegations of the amended petition. These defendants also alleged as a defense that the petition failed to state a claim upon which relief can be granted and as an additional defense alleged that the plaintiff did not perform any real services for which he would be entitled to a legal fee and that the prosecution of this case constitutes a violation of Canons of Legal Ethics and the Code of Professional Responsibility adopted by the Kansas Supreme Court. The answer filed by the Hackler firm admitted the filing of the divorce case and the fact that a substantial attorney fee was earned. Other allegations of the amended petition were denied. The defendant, John Anderson, Jr., filed his answer admitting par-

ticipation of all parties as counsel in the divorce action and prayed the court for an appropriate order for determination of the payment of fees as justice requires.

At the outset of the litigation the defendants, Breyfogle firm, filed a motion to dismiss. Affidavits were filed by the parties in support of and in opposition to this motion. The district court denied the motion on the grounds that there were material questions of fact in dispute and therefore the case was not ripe for determination of issues of law. The defendants, Breyfogle firm and Hackler firm, on this appeal maintain that the trial court erred in overruling this motion to dismiss. We have concluded that at the time this motion was presented and denied by the trial court there were genuine issues as to material facts in regard to the legal services which might have been rendered by the plaintiff Palmer. We have concluded from the record before us that the evidence in this case must be considered in determining the issues of law presented. For this reason we will summarize the testimony presented at the trial.

The first witness called on behalf of the plaintiff was the plaintiff Thomas P. Palmer. Palmer has been a practicing lawyer since his admission to the bar in June of 1911. He is 85 years old. He has officed with David W. Carson since 1940. He described himself as an individual practitioner and not a member of the Carson firm. He first met Wife when she joined the Trap Shooters' Association in 1961. He got to know her through trapshooting and skeet. In 1971, Wife called him at his office and said she wanted to talk to him. She came to his office and said she was having some marital troubles. She said she already had hired an attorney in Saint Joseph, Missouri. Palmer told her that she would have to dismiss the St. Joseph attorney before he could represent her. He also suggested that the case should be filed in Johnson county. On this same occasion he introduced her to David W. Carson, and the three of them talked about the case. They talked about the desirability of filing it in Johnson county. The implication from his testimony is that she had dismissed her St. Joseph attorney before consulting jointly with Palmer and Carson. Carson suggested to Wife that Peter Martin be retained to assist as his office was in Johnson county. The only mention of fees was Carson's advice that Husband would have to pay them. On direct examination Palmer testified that while the case was pending in Johnson county Wife called him at home one night and said she was concerned about the way

the case was proceeding and wanted to know what Palmer could do about it. Palmer told Carson about the conversation and he got in touch with John Anderson, Jr. of the Johnson county bar. Palmer stated that he had some other conversations with Wife over the telephone. He testified that he more or less kept track of the progress of the case since he was interested. He considered himself to be her lawyer even though the Carson firm later withdrew. He did not type any of the pleadings, did not appear in court, but considered himself responsible for the conduct of the case because Wife was his client and he should take an interest and if necessary look into the matter for her. He did on the one occasion when she became dissatisfied. On cross-examination Palmer stated that the last divorce case in which he had actively represented a client was 12 or 15 years before in Wyandotte county. He has never tried a divorce case in Johnson county. Wife did not pay him a retainer fee. In regard to Palmer's participation in the divorce case his testimony was as follows:

"Q. And I think I am correct, you did not participate in this case in any way, shape or form, as far as the pleadings or the Court appearances, or anything like that, did you?

"A. I did not.

"Q. And you did not participate in the settlement discussions; you didn't take depositions; you did nothing at all except confer with Wife on two or three or four occasions?

"A. I was never asked to. I was totally ignored by Mr. Martin in this case, and so I thought it was their duty, if they wanted any help or consideration from me that they would be in touch with me.

"Q. Is it correct that prior to the institution of this case, you had never known Peter Martin?

"A. Never knew him.

"Q. So there's no way you could have referred this case to Peter Martin?

"A. Through Mr. Carson it was referred to Peter Martin by telephone, when the three of us were in the office."

Palmer stated that he had telephoned Martin's office and left his name, but Martin had not returned his calls.

His name never appeared as counsel of record in the divorce case. He did not get John Anderson, Jr. into the case. His only association with David W. Carson is that he pays rent and telephone bills but has no arrangement of partnership or division of fees. Palmer never submitted a statement for payment of fees either to the Breyfogle firm or Hackler firm. He never prepared a statement as to the time he had spent in regard to the divorce case. He stated that the fee he was seeking from the court would be on a *referral*

*basis.* Palmer had no time records of the number of hours he had spent on the divorce case; he had nothing to present in writing to the court to show the services which he had rendered. On redirect examination Palmer gave his opinion that one-third of the total attorney fees or $30,000 would be proper remuneration for the services which he had rendered. On additional cross-examination Palmer testified that he had no idea how much time he had put in the case. In addition to plaintiff's live testimony his deposition was received into evidence in its entirety. Much of his deposition involved the same matters which he testified about at the trial and will not be repeated. At the time his deposition was taken in July 1973 Palmer was not involved as counsel of record in any litigation. He had not been counsel of record in any lawsuit in the past five years. When Wife first came into his office he estimated that the two of them talked together an hour or longer and then they talked further with Carson. He conferred with Wife two or three months after that when she indicated that she was not happy with the way things were going. That was about the time that John Anderson, Jr. became co-counsel. These conferences were not at his office, sometimes at the shooting range and sometimes over the telephone. He does not keep any diary or time records of any sort. Plaintiff stated that after the telephone conference when Wife stated she was dissatisfied he did not have any subsequent conversations with her. He did have a conference with Anderson when defendant Martin was present but this was after the divorce case had been concluded. Palmer never met or talked to Peter Martin until one day in John Anderson's office after the divorce case was over. Counsel for the defendants asked the plaintiff to put it in his own words, any way he wanted to, the amount of work he had put into the case. He replied:

"A. I have answered it. I have not kept a record of it and I don't know exactly what time was spent on it."

Palmer was aware of the fact that David W. Carson had withdrawn from the case because there might be a conflict of interest. He did not have any arrangement with Carson as to a division of the attorney fees. He figured whatever the referral fee would be, would be his fee. Palmer's description of a referral fee was as follows:

"A. The referral fee would be, as I understood it, what is in the law as to whether you are actively engaged in the matter or whether you are not

actively engaged. If you are not, there is a third of the fee you are entitled to on a referral basis."

If he was inactive entirely, he would expect the referral fee to be one-third. Palmer was firm in his testimony that he did not have any agreement with defendant Martin or any members of the Breyfogle firm to pay a referral fee to him. However, when Carson talked to Martin he understood that there would be a fee on the basis of the referral. That was the day Carson first talked with Martin over the telephone.

The plaintiff's next witness was David W. Carson. Carson has been a practicing attorney in Wyandotte county for 34 years and has maintained the same suite of offices since about 1940. He met Wife through Mr. Palmer bringing her into his office and telling him that she was having marital difficulties. Some six months before her husband had come in and discussed in a general way the divorce laws of the state of Kansas. He did not charge Husband a fee and was not asked to go ahead on his behalf. The first thing he told Wife was about this previous consultation with Husband. He did not want to have her husband's counsel making an issue of it. Wife was willing to have Carson associate with Palmer in her representation. He advised her that she probably should have an attorney in Johnson county. Apparently Palmer had discussed this previously with her. Carson proceeded to contact Peter Martin and the case was filed in Johnson county. Martin was contacted at his instance. Fees were not discussed with Wife but she was apprised that she would not have to put out anything. Following the filing of the case Carson contacted Husband's attorneys in Chicago by letter. They advised him that Husband objected to his appearing in the case. Carson decided it was the best thing for him to get out of the case although he did not consider that there was any actual conflict. The reason for hiring a Johnson county attorney was that Palmer had persuaded Wife that she would probably get a better hearing there because of the familiarity of the courts in that county in handling estates and larger sums. Following Carson's withdrawal from the case he did have further contact with Palmer in regard to the case. Palmer stated that Wife was upset with the progress of the case and was extremely upset with the way the matter was being handled by Martin. Carson told Palmer that they should have John Anderson, Jr. as co-counsel in the case. Palmer participated in the arrangement to have Anderson as co-counsel.

There was never any question that Martin knew the case origi-

nated with Palmer and Palmer was in it all the way through and having discussions with Wife. After the divorce case was over and just prior to the filing of the instant case, Carson testified that he had had a conversation with Martin in regard to a fee. Martin stated that they should work out something but that there was a serious question in his mind about an ethical problem due to a recent canon of ethics and he could not pay the usual one-third referral fee. This conversation was after a dispute had actually developed regarding the fee. Carson was asked to explain his understanding of a referral fee basis. His explanation was as follows:

"A. Well, as Mr. Anderson has stated, those of us who have practiced for a number of years have always . . . handled matters on the basis that the attorney to whom the business originally came was naturally entitled to a substantial portion of the fee. It used to be that on a referral basis the attorney to whom the business originally came got half, regardless of participation or not. Then the rules of the two bar associations were changed to the point where the half was only in the event of participation in the actual trial and the *one-third was on the basis of referral but no participation, whatsoever."*

Carson was of the opinion that the supportive role of Palmer with Wife was of great influence throughout the case. On the basis of Palmer's supportive role and the fact that the case would not even have been in Johnson county if it hadn't been for Palmer, on the basis that these people would not have even seen the case, on the basis of the amount of money involved, and on the basis of the fee that they received, he did not think that one-third of the total fee was excessive at all. On cross-examination Carson testified that he could not tell how many hours Palmer had spent on the case and that he did not know how many hours the Breyfogle firm or the Hackler firm had put into the case. He considered these people as time sheet lawyers. He stated they do not understand the emotional portion of a case of this kind or the impact it has or the importance of somebody who can sustain a person while going through a case like this. Carson had no idea the number of hours anybody spent on the case. The following question and answer are shown on the record:

"Q. You do know the Supreme Court has outlawed, so to speak, referral fees as of 1970?

"A. This is your opinion."

On rebuttal Carson testified that at the time of his telephone conversation with Martin when he advised Martin that he was with-

drawing, Martin told him that the most he could pay Palmer would be $10,000.

The plaintiff's third and final witness was John Anderson, Jr. He had known Husband and Wife for some years and the way he became involved was that he received a telephone call from David Carson setting up a luncheon engagement with him, Carson, Palmer, and Wife. There he learned that Carson had been co-counsel with Peter Martin but that Carson had withdrawn from the case at the objection of Husband's counsel. Wife asked him to enter the case. She first talked with Palmer as she had been a long time friend of his in trapshooting. He understood that she was Mr. Palmer's client. At that time Anderson was a member of the Hackler firm. Anderson was asked what his understanding was in regard to the fee and he answered as follows:

"A. Well, let me just say it in my own way, and if it can be of help to the Court in solving this problem, it will be of help, but my understanding was, if it was Mr. Palmer's case and if Mrs. _____, through the meeting with Mr. Palmer and myself and with Mr. Carson, although he said he was getting out of the case, it was my understanding that a proper fee, whatever it was, would be payable to Mr. Palmer. . . ."

He did not consider that Palmer was to receive a forwarding fee but he figured that Palmer would have an interest in the fee. There was no dollar sign fixed to it. He worked with Martin in the case. He met with Palmer on at least two other occasions after the first meeting; he consulted Palmer by telephone, knowing that he officed with Carson and knowing that Carson was acquainted with Wife and had conferred with her on numerous occasions. Although he knew that Carson had withdrawn from the case, he consulted with Carson only because of the relationship with Mr. Palmer. He considered that Palmer was in the case throughout. The Breyfogle firm carried the burden of the legal work.

Martin made at least two trips to California to take depositions. Anderson made one trip to California and took depositions in Los Angeles. It was his opinion that the counseling and the responsibility that an attorney has in counseling with a client and the reliance upon that attorney's counseling with a client can sometimes outweigh an inordinate amount of work if the client feels that way about it. Anderson stated that he would have no "qualm or question about Mr. Palmer having a third of the fee in this case." He would have to say that Palmer did not contribute as much as Martin and himself in respect to the hours spent. At the luncheon

meeting when he was employed, Wife was given to understand that she was not going to pay any portion of the fee as it would be paid out of an allowance. The settlement provided for a lump sum which would include the fee, but the amount was understood before the settlement was signed and Wife was completely assured that she would not have to pay anything out of her pocket. He does not know that Wife considered Palmer and Carson both as counsel at the time she was talking to Palmer. All he knows is how he got into the case and how it was explained to him in her presence. It was his understanding that she was Palmer's client. Whether or not it was only for the purpose of getting Carson into the case to help, which makes sense, he was not going to put words into her mouth. After the luncheon when Anderson was employed, he consulted with Palmer about this litigation at least twice. He did not write or memorialize those conversations. The case was filed on November 1, 1971, and his formal entry of appearance was filed on November 12, 1971.

On cross-examination Anderson testified that he could not estimate the number of hours he was counseling either by telephone or directly with Mr. Palmer in regard to the case, maybe ten hours, maybe not that much. The case was started in November 1971 and he ran for governor in 1972. When he was gone, Mr. Hackler and Mr. Logsdon, of his firm worked on the case. He thought he talked to Palmer at least three times. These luncheon meetings of which he had two lasted more than one hour. Anderson testified that the total attorney fees paid in the divorce case to all the attorneys as a part of the settlement was $87,500. The Breyfogle firm and Hackler firm shared equally in this attorney fees. Anderson emphasized that there was an understanding before the settlement was made that there was one fee, that it was not enhanced and enlarged because of the number of attorneys in the case and that was explained to Wife. In regard to whether Wife had been given to understand Palmer would share in the fee, Anderson testified that he did not know. John Anderson, Jr. was the plaintiff's last witness.

The defendants offered the deposition of Wife taken September 26, 1973. She testified that she called Palmer to arrange for an appointment to discuss marital problems and that this was the first time that she had talked to him professionally. She talked to him at that time about retaining his partner, David Carson. When she first came to Palmer's office she talked at length with him and the

two of them talked with Carson. At this first conference with Carson and Palmer, Wife told them that she would like to hire David Carson to represent her but that she would have to dismiss Mr. Kranitz, her St. Joseph attorney first. She later discharged Mr. Kranitz. She consulted with several attorneys in Kansas City when she thought about changing from the attorney in St. Joseph. Eight firms were mentioned. She is not sure whether she or Mr. Carson selected the Breyfogle firm. She really hadn't selected any firm, she was just talking to people still. She was asked whether or not she subsequently conferred professionally with Mr. Palmer about her case. She replied:

"A. Well, really, it was more with David Carson. I can't remember. . . . I would not say that I really consulted with him in—well, I was consulting with David.

"Q. Did you consult with Palmer in a professional manner subsequent to that time, where you considered yourself to be his client and he your attorney?

"A. I wouldn't say that. However, I was consulting with the firm. That is the only way I can say it.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Well, after that time, did you have any discussion with Tom Palmer about how your case was going or any instructions you wanted him to do, or anything like that?

"A. I really can't remember. I can't remember a specific conversation. . . . He may have been—it could be he was around there, but there was a period of time when they were not exactly representing me and we were discussing it. . . .

"Q. Do you remember ever calling him at home and asking specifically for legal advice after that time?

"A. Well, it was the other way around. He called me and asked how I was getting along. Wait a minute. I think I might have called him at home. I am sure I did. I am sure I did, especially when my husband . . . objected to David Carson being on the case."

She really couldn't remember what the conversations with Palmer were about. She was more or less in touch with him. The Carson firm was asked not to represent her. They would not have any part in it, although they did help her a lot with moral support, maybe. By that she just means they were friendly after she moved to Kansas City.

Wife did not have any recollection of the number of hours that she talked with Palmer; she did not see him much except for just some conversations. It would not have been too many hours after Carson was asked not to represent her. She was asked the following question and answered as indicated:

"Q. And the contacts after that would be of a friendly supportive nature because of the social relationship between you and Palmer; is that correct?

"A. Yes. But my opinion on that and a lawyer's opinion on that are two different things, I have found out. A friendly supportive nature can mean they are doing their work. I did not know that at the time."

The defendant, Peter A. Martin, testified that he was a practicing lawyer in Johnson county and a partner in the Breyfogle firm. The dispute in this case arose out of the divorce case which was litigated in Johnson county. His first contact in the case was on Friday evening, October 29, 1971. He received a telephone call from David W. Carson asking if he would be available to act as co-counsel with him in a divorce case which should be filed in Johnson county. Arrangements were made for him to meet Carson and Wife on the following Sunday evening, November 1, 1971. It was agreed that the case should be filed in Johnson county. Martin arranged for Wife to lease an apartment in Merriam, Kansas, to establish a Johnson county residence. Martin contacted the movers, the telephone company, and the rental company. Wife stayed in Johnson county on that Sunday night and actually moved into the apartment on Monday morning. Martin prepared the suit papers and secured the client's signature. Carson told him to go ahead and put Carson's name on the petition and to sign his name. The following day, November 2, Carson advised Martin that he had received a communication from Husband objecting to Carson continuing in the case. Carson wanted to know what could be worked out on the fee. Martin advised him that there were some ethical problems involved, but he would try to work something out with him. There was no discussion of paying a fee to Palmer. Martin was apprehensive about paying Carson a fee because of the conflict of interest and because of the canons of ethics. Martin told Carson that they would have to find a legal basis for paying Carson and Carson was concerned because Martin did not make a commitment on the fee. Carson withdrew formally from the case within a matter of days thereafter. On November 9, 1971, Martin received a telephone call from John Anderson, Jr., advising him that he had been retained by Wife to assist him in the case. Anderson was in the case eight or nine days after it was filed. Martin testified that he kept meticulous records and sent copies of letters and memorandums to all attorneys involved in the case. He did that routinely with Anderson and Hackler. He did not send any communication to Palmer. He did not know Palmer was in the case. In regard to

complaints about the progress of the litigation Martin testified that Anderson was retained only eight or nine days after the case was commenced. At that time the case had just been filed, an interlocutory support order obtained and summons sent all around the country. A private detective was retained to exercise surveillance and ultimately to serve Husband with papers. The divorce case involved between seven and eight million dollars' worth of property. Wife received something short of $2,000,000, plus retaining all of her property which was worth in the neighborhood of $1,000,000. The legal services in the case were difficult because of the size of the case and the tax aspects. The discovery of the real worth of family assets was important. Trips were made to California; buildings were inspected; a special stockholders' meeting of the family holding company was attended. Many conferences were had with the private detectives in California. It was necessary to confer with various tax consultants and there were probably one hundred conferences between the attorneys for Husband and Wife. Martin estimated his actual time spent in the case at about 300 hours minimum. Palmer did not any way assist him in the case. Martin was never aware that Palmer was involved in the case except for his having brought Wife into Carson's office in the original instance. Martin never had any contact whatsoever with Palmer nor did Martin know that he had a continued interest in the litigation. Palmer never wrote him a letter, never called him by telephone or sent him a statement for any time he expected to be paid for. The total fee was $91,000 from which was deducted $3,527 for expenses. The net professional fee would be $87,473. The litigation lasted approximately ten months. Martin never consented on behalf of anyone to pay Palmer any portion of the fee.

The settlement in the divorce case included the attorney fees which were added to the lump sum of cash which Wife was to receive. No amount was mentioned or built into the settlement for Palmer. At the time of Martin's initial conversation with Carson he understood and assumed that he would be dividing the work and fee equally with Carson. Though Martin took the lead he had no quarrel with a 50-50 division of the fee with the Anderson firm. After the controversy over Palmer's fee arose the sum of $30,000 was deposited in a Certificate of Deposit and the balance distributed between the Breyfogle and Hackler firms. After Anderson entered the case Martin had a few conversations with Carson. Martin was

concerned about talking to him because of Carson's previous withdrawal from the the the case.

The defendants' only other witness was Wilson E. Speer, a member of the Hackler firm. He testified that the Hackler firm's records show that that firm expended a minimum of 133 hours in the divorce litigation.

At the conclusion of the evidence the district court, stating that it was making a division of the fee in proportion to the services performed and the responsibility assumed by each, granted the plaintiff Palmer a judgment for $15,000 on the evidence presented. The court emphasized that this was not a finder's fee but what it considered to be a fair proportion of the total fee, based upon the service Palmer performed and responsibjlity that he had assumed. Both sides have appealed to this court. The defendants maintain that Palmer was not entitled to any attorney fee under Disciplinary Rule DR 2-107. The plaintiff Palmer takes the position that the court erred in failing to award him $30,000, a full one-third share of the total fee paid in the divorce case. He contends that the Wyandotte and Johnson county minimum fee schedule allowance of a one-third forwarding fee should have been given effect by the trial court.

We should now turn to DR 2-107 to analyze its provisions and to consider its purpose. The forerunner of DR 2-107 was Canon 34 of the Canons of Legal Ethics. It provided simply that no division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility. DR 2-107 was adopted to clarify Canon 34 and to make the canon more specific. On a number of occasions in the course of the trial of this case the trial court pointed out that for many years it was customary in Kansas for a forwarding attorney to receive one-third of any fee which was generated in a particular lawsuit. Such a fee was expected even though the forwarding attorney did not participate in the lawsuit. Such a fee has been described as a finder's fee or a forwarding fee or sometimes as a referral fee. It was the intention of the American Bar Association and also that of this court in adopting DR 2-107 to prohibit this long followed procedure.

The evils of the referral fee have been well recognized. It has been said that admission to the practice of law is something more than admission to an association of businessmen or tradesmen. It is membership in an ancient and honorable profession that has for

its goal the furtherance of the administration of justice, and the attorney is an instrument for the achievement of this noble purpose. (*McFarland v. George*, [C. A. St. Louis, 1958] 316 S. W. 2d 662.) Members of the public who seek the services of an attorney cannot be treated by him as mere merchandise or articles of trade in the market place. A client is not an article of property in which a lawyer can claim a proprietary interest, which he can sell to other lawyers expecting to be compensated for the loss of a property right.

Henry S. Drinker, author of Legal Ethics in a panel discussion reported in 7 University of Florida Law Review, pp. 433, 434 stated:

"It makes the law too much of a business if you are practicing the way you would as a broker. The lawyer is not supposed to get paid for anything but the legal services that he renders, and selling a man a client is not a legal service."

In *Weil v. Neary*, 278 U. S. 160, 73 L. Ed. 243, 49 S. Ct. 144, the Supreme Court of the United States pointed out the inherent evil of the referral fee to be that there would be a temptation to both attorneys to seek to increase the allowance of fees so as to secure a generous provision for both. The motive for excessive allowances could hardly be more direct.

With these evils in mind this court adopted DR 2-107 effective July 1, 1970. DR 2-107 prohibits a lawyer from dividing a legal fee with another lawyer who is not a partner or associate of his law firm, unless three conditions are met:

(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) The division is made in proportion to the services performed and responsibility assumed by each.

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

Here the total fee for services in the divorce case was approximately $87,000. There is no contention by any of the parties that this fee exceeded reasonable compensation for all legal services rendered the client in this case. The case was extremely complex and difficult and the total property involved was in the neighborhood of eight or nine million dollars. We will proceed on the theory that the third requirement of DR 2-107 has been satisfied and turn to the first two requirements.

DR 2-107 requires that the client consent to the employment of the other lawyer after a full disclosure that a division of fees will

be made. There is no dispute in this case that Wife fully con-
sented to the employment of Peter Martin of the Breyfogle firm
and also John Anderson, Jr., of the Hackler firm. The evidence
is also undisputed that both of these attorneys were employed by
David W. Carson and not directly by the plaintiff Thomas P.
Palmer. The problem presented is whether or not a full disclosure
was made to the client that a division of fees would be made. The
trial court at the time it announced its decision from the bench
stated in this regard as follows:

". . . There is no clear evidence that any disclosure was made that there
would be a division of . . . fees. I have read Mrs. _____'s deposition
and that question, frankly, was never asked her. She was told, there isn't
much question about this, that Mr. _____ would be expected to take care
of all of her legal expenses. In a way, that satisfies the requirement, I think,
that a disclosure be made to her that there would be a division of fees."

We agree with the trial court that the disclosure of a division of
fees to the client was not shown by any clear evidence. It is
obvious from the testimony of several witnesses, however, that
Wife understood that all of her attorney fees were to be paid by
her husband as a part of any settlement reached in the case. She
was apparently so advised by Carson in their original conversation.
She was again advised of this fact at the luncheon meeting where
Anderson was employed as co-counsel. It is, of course, usually not
feasible at the beginning of litigation for an attorney to advise his
client of the exact proportions upon which the attorney fees are
to be divided. That, of course, will depend upon the proportion of
the legal services performed and the responsibility assumed by
each attorney in the course of the litigation. The rule simply
requires that before the client consents to employment of the other
lawyer he should be made to understand that a division of fees
may be made, that the division is to be made in proportion to
the services performed and the responsibility assumed by each, and
that the total fee to be paid for all lawyers will not exceed what
is reasonable compensation for services rendered. Here the parties
agree that the client is not obligated for additional fees to any of
the attorneys involved. Since Wife was advised from the beginning
of the case that she was not going to be required to pay any portion
of the attorney fees out of her own pocket and that the fees
awarded by way of settlement in the divorce case would cover all
legal services rendered in connection with that litigation, we cannot
say that the first requirement was not satisfied. We will thus turn

to requirement No. 2 which presents the important issue which has been raised on this appeal.

DR 2-107 requires that a lawyer shall not divide a fee with another lawyer, unless the division is made in proportion to the services performed and responsibility assumed by each. We are convinced that merely to recommend another lawyer or to refer a case to another lawyer and to do nothing further in the handling of the case cannot be construed as performing a legal service or discharging responsibility in the case. The service and responsibility referred to in DR 2-107, before a lawyer is entitled to a division of the fees, must relate to an actual participation in or handling of the case. The rule would be meaningless if this were not so. The word legal "services" is not difficult for the members of the legal profession to understand but the meaning of the word "responsibility" requires careful analysis. In *McFarland v. George,* supra, the court discussed the meaning of the word "responsibility" under Canon 34 using the following language:

". . . The primary meaning of 'responsibility' as found in the dictionaries is the state of being answerable for an obligation. . . . The term 'responsibility' includes judgment, skill, ability and capacity. . . . Legal responsibility is the state of one who is bound or obliged in law and justice *to do something.* . . . 'One's duty is what one is bound or under obligation to do. One's responsibility is its liability, obligation, bounden duty.' The word 'responsibility' as used in the rule means the doing of something. Any other meaning would render the rule meaningless. We agree with the statement of Henry S. Drinker, in his work, Legal Ethics, when discussing the rule at p. 186 . . . : 'The service and responsibility must, to be effective, relate to the handling of the case.' If the division of fees is to be placed on the basis of how much service or responsibility each contributed in connection with the legal services rendered in the case, obviously, the responsibility called for under the rule must be related to the legal services rendered *in the actual handling of the case."* (Emphasis supplied.) (p. 671.)

In *McFarland* it was undisputed that the plaintiff performed no legal services and assumed no responsibility in the handling of the will contest which was the litigation involved. The case now before us must, of course, be decided on the basis of its own facts. The issue which we must determine is whether there is substantial competent evidence to support the finding of the trial court that based upon a division of the attorney fees in proportion to the services performed and responsibility assumed by each attorney, the plaintiff Palmer was reasonably entitled to $15,000. We have concluded that the findings of the trial court are not supported by the

evidence. In reaching this conclusion we have considered the following undisputed facts as established by the record:

(1) There was no express agreement between Palmer and any member of the Breyfogle firm that a referral fee was to be paid to Palmer. Any discussion or agreement as to a division of attorney fees between Carson and Martin was based on the assumption of Carson's equal participation in the litigation in the furnishing of legal services.

(2) At the time plaintiff Palmer first discussed the case with Wife he had not been counsel of record in any litigation for a period of five years. He had not actively represented a client in a divorce case in 12 to 15 years and had never tried a divorce case in Johnson county. It is inconceivable that he ever intended to actively participate in the handling of the litigation.

(3) Wife never paid Palmer a retainer nor was a retainer fee ever mentioned by Palmer.

(4) By his own admission Palmer did not actively participate in the handling of the divorce case in any way, shape or form. He did not appear as counsel of record.

(5) The plaintiff Palmer did not become acquainted with Peter Martin until after the divorce case had been completed when the question of a referral fee for Palmer was raised. The divorce case was not referred to Peter Martin by Palmer but by David W. Carson.

(6) Palmer never kept any records of the time he spent in consultations with Wife. He had no idea how much time he had put into the case. He offered no testimony as to the nature of the legal advice he gave to Wife. According to plaintiff Palmer the conversation with Wife in regard to the client's dissatisfaction with Martin's services occurred two or three months after the case was filed. Palmer testified that this conversation brought about the employment of John Anderson as co-counsel. The record clearly shows that Palmer was first contacted for employment on October 29, 1971. Martin consulted with Carson and Wife on the following Sunday evening which would have been October 31, 1971. The divorce case was filed within two or three days thereafter. The day after the case was filed Carson withdrew from the representation of Wife because of a possible conflict of interest. On November 9, 1971, Martin received a telephone call from John Anderson, Jr. advising him that Anderson had been retained in the case as co-counsel. Anderson's formal entry of appearance was filed in the

divorce case on November 12, 1971. Palmer's testimony was that all of his conversations with Wife occurred before the employment of John Anderson as co-counsel in the case with Peter Martin. It does not sustain plaintiff's position that he provided a supportive role to Wife during the ten months the litigation was pending.

(7) Plaintiff offered no testimony to show the value of his time on a quantum meruit basis such as his customary fees for his services.

(8) The plaintiff Palmer never prepared an itemized statement of services rendered or submitted the same to Martin at any time or to the court at the trial. The only conclusion is there was nothing to submit.

(9) Palmer had no idea how much professional time either the Breyfogle firm or the Hackler firm had spent on Wife's behalf. He did not seem to be concerned about it. His claim was for one-third of the fee without regard to the services performed or the responsibility assumed.

(10) David W. Carson did not know how much time Palmer had spent in the case nor how much time the Breyfogle firm or the Hackler firm had spent in the case. He likewise was not concerned about it in stating his opinion that the fee for Palmer should be one-third.

(11) It is clear from Wife's testimony that she considered she was being represented by the Carson firm, not Palmer. She had no specific recollection of conversations with Palmer or the nature of the conversations. She considered any contacts with Palmer as of a friendly supportive nature because of the social relationship between herself and Palmer as fellow trapshooters. She did not consider herself as Palmer's client and him as her lawyer.

(12) The case was filed by the plaintiff Palmer strictly on the theory that he was entitled to a one-third referral fee as the minimum fee to be paid in cases where forwarding counsel does not actively participate in the handling of the case. Both the original petition and the amended petition were framed on that specific theory. In a letter written by Carson to the Kansas Bar Association advisory committee on ethics, he stated that Palmer as the originating source of the case was entitled to the minimum fee contained in the fee schedules of the Wyandotte County and Johnson County Bar Association to be paid where the referral attorney *does not actively participate in the handling of the matter.*

On the basis of this undisputed evidence we have no hesitancy in holding that the plaintiff Palmer did not perform any service or assume any responsibility in the divorce case within the meaning of DR 2-107. Plaintiff did not do anything which related to an actual participation in or handling of the case. We reject the concept that "getting the client" is the performing of a legal service or the assumption of a responsibility. We also reject the concept that "trying to keep the client happy" while litigation is in progress, carried out in a friendly supportive way because of a social relationship not related to an actual participation in or the handling of the case, constitutes the performance of a legal service or the assumption of responsibility within the meaning of DR 2-107. The plaintiff here should have been denied relief for the simple reason that there was a complete failure of proof by substantial competent evidence that he performed any services or assumed any responsibility related to the divorce case where the attorney fee was earned. It seems to us that where a lawyer sues his client or anyone else for services rendered, he should have some reasonable idea and be able to state the nature of the services which he performed and the professional time and effort he expended in rendering such services. We would require no less of an artisan or a laboring man who is seeking compensation on the basis of quantum meruit.

For the reasons set forth above we have concluded that this case must be reversed on the appeal. In view of our disposition of the case on appeal it is unnecessary to discuss the points raised on the cross-appeal. The judgment of the district court is reversed and judgment is rendered in favor of the defendants for their costs.

FATZER, C. J., dissenting: I am respectfully entering my dissent to the court's opinion. The comments and judgment of the district court follow:

"Well, the easy way to do this is to take it under advisement and go back and quietly write a letter, but I never did anything the easy way. I would rather make my decision right now, so here it is.

"I believe Mr. Palmer said he was 85 years old. He has testified, and I know it is a fact, that he's had a long association with the Carson family, first with old Dave and later on with David W. I believe he said this went over the past 30 years, 33, maybe. I believe he said it started in 1940.

"The evidence does disclose that Mrs. . . . came to Mr. Palmer, she was in fact, his client. She took her case to Tom when she needed a lawyer. By this time Tom was well along in years, was not coming to the Courthouse every day. And I take it from the evidence that quite often David did things for Mr. Palmer in Mr. Palmer's name.

"Mr. Palmer, either directly or through Mr. Carson, referred Mrs. . . . to Mr. Martin. I have to think that Mr. Carson knew Mrs. . . . although on the evidence here, she didn't know Mr. Carson, she didn't know Mr. Martin, either one.

"At any rate, Mrs. . . . continued to seek comfort and advice from Mr. Palmer. Some of this was furnished directly by Mr. Palmer, some for Mr. Palmer, apparently, by Mr. Carson. This goes back, again, to the strange workings of that office up there, which is like no other, but maybe all law offices are different. One example that she went back was some days later for, I don't know why, but through Mr. Palmer, either directly or indirectly, Mrs. . . . was put in touch with the Hackler, Anderson firm.

"Ultimately, a fee of $87,500 was allowed to cover all services rendered on Mrs. . . . behalf by all of her attorneys. So then we go to this code of ethics which was adopted by the Kansas Supreme Court, 'A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate in his law office, unless first: The client consents to employment of the other lawyer.' There isn't any question about that. 'After a full disclosure that a division of fees will be made.' There is no clear evidence that any disclosure was made that there would be a division of fees. I have read Mrs. . . . deposition and that question, frankly, was never asked her. She was told, there isn't much question about this, that Mr. . . . would be expected to take care of all of her legal expenses. In a way, that satisfies the requirement, I think, that a disclosure be made to her that there would be a division of fees.

"Then we jump to the third one, that the total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client. I think this requirement is made so the crux of this controversy is, number two, the division is made in proportion to the services performed and responsibility assumed by each. It's been apparent to everybody from the start that was the crux of this lawsuit.

"The fee of a lawyer in a divorce case where he represents the woman, in my mind, is made up of five things: First, getting the client; secondly, preparing the case; thirdly, trying or settling the case; fourthly, trying to keep the client happy while the litigation is in progress; and fifthly, convincing the Court of the value of the lawyers' services and the size of the allowance that should be made. Those five things go into the—what you ultimately get paid in any given case.

"The evidence here is that Mr. Palmer was solely responsible for number one, getting the client, and that he had quite a little bit with number four, which was keeping the client happy. It is made to appear that Mr. Palmer, either personally or with the aid and assistance of Mr. Carson, made one of the major decisions before Mr. Martin was ever brought in the case, and that is, that the case should be filed in Johnson County, where the Courts are used to dealing with moneyed people, which we have not to much occasion to deal with here in Wyandotte County.

"So going back to number two, making a division of the fee in proportion to the services performed and the responsibility assumed by each, I do grant the plaintiff a judgment for $15,000 on the evidence I have heard. This is not a finder's fee; it is what I consider a fair proportion of the total fee, based on

the services he performed and responsibility that he assumed. Costs will be taxed against the defendants.

"That's the best I can do with this lawsuit. It may be that neither side is pleased, but I have given it my honest effort and that's it. We will keep all the exhibits pending a decision as to appeals taken at that time. Excepting that this Court file ought to go back to Johnson County, I would permit it to be withdrawn and certainly be replaced if there is to be an appeal."

In my opinion there was substantial evidence to support the findings and judgment of the district court. I would affirm the judgment.

FROMME, J., not participating.