364 S.E.2d 812

William E. WATSON, Frank Cuomo, Jr., Raymond A. Hinerman, William T. Fahey, and Fred Risovich, II, d/b/a Barnes, Watson, Cuomo, Hinerman & Fahey

v.

Dolores K. PIETRANTON, Executrix of the Estate of Frank A. Pietranton.

No. 17193.

Supreme Court of Appeals of West Virginia.

Dec. 15, 1987.

Concurring Opinion Dec. 18, 1987.

Rehearing Denied Feb. 3, 1988.

Landers P. Bonenberger, Wheeling, for Watson et al.

Jolyon W. McCamic, Robert P. Fitzsimmons, Wheeling, for Pietranton.

BROTHERTON, Justice:

Dolores K. Pietranton, as executrix of the estate of her deceased husband, Frank A. Pietranton, an attorney, appeals a summary judgment in which the Circuit Court of Hancock County held that the deceased attorney's fee agreement with another attorney was void as against public policy because the fee agreement violated DR2–107 of the West Virginia Code of Professional Responsibility.

Frank A. Pietranton practiced law for many years in the northern panhandle of West Virginia. In about 1978 Mr. Pietranton became ill and was unable to actively practice law. As a result of his illness, Mr. Pietranton associated with William T. Fahey, a young attorney practicing in the same locale, to assist him with several cases. Mr. Fahey and his law firm, Barnes, Watson, Cuomo, Hinerman & Fahey, associated with Mr. Pietranton in approximately thirty-five cases. There was an oral agreement between Mr. Pietranton and Mr. Fahey as to how fees received from these thirty-five cases were to be shared.

Mr. Pietranton died on June 23, 1980, before all of the thirty-five cases had been completed. In all of the cases resolved before Mr. Pietranton's death, the fees generated from the shared cases were divided equally between Mr. Pietranton and Mr. Fahey.

After Mr. Pietranton's death, Mrs. Pietranton continued to turn over to Mr. Fahey cases which were in Mr. Pietranton's office at the time of his death. Mrs. Pietranton continued to receive fees from these cases, as well as from those cases which were referred to Mr. Fahey earlier but remained unresolved at the time of Mr. Pietranton's death, according to a fee schedule arbitrarily determined by Mr. Fahey. These fees were in amounts ranging from twenty percent to fifty percent of the total fees realized in the cases. Mrs. Pietranton never received any breakdown of the fees when she received her check.

The cases in which Mr. Pietranton asked Mr. Fahey to participate included a case involving the wrongful death of two children of Royal and Kelly Sayre in a mobile home fire. By letter to Mr. Fahey dated January 30, 1980, Mr. Pietranton forwarded the Sayre file to Mr. Fahey. The letter contained a synopsis of the investigation in the Sayre matter as reported by Attorney Dean DeLaMater,[1] as well as references to Mr. Pietranton's interview with Mrs. Sayre. The record reveals also that Mr. Pietranton entered into a fee agreement with the Sayres dated January 30, 1980. Apparently Mr. Fahey told Mr. Pietranton that the wrongful death claim would be brought most properly as a products liability action against the mobile home manufacturer. Mr. Pietranton agreed to assist Mr. Fahey in getting the name of the mobile home manufacturer because he knew where the burned wreckage had been taken. In addition, Mr. Pietranton agreed to pursue, along with his investigator, certain other information and to deliver that information to Mr. Fahey for preparation of a complaint.

---

1. A conflict of interest required Mr. DeLaMater to withdraw from representation of the Sayres in the wrongful death matter.

Before this work could be performed, however, Mr. Pietranton died. Mr. Fahey then contacted the Sayres regarding their claim and informed them that his law firm had the Sayre file. Mr. Fahey told the Sayres that his firm was willing to handle the claim if the Sayres desired, or that the Sayres could take their file to another attorney. The Sayres' only inquiry concerned fees. The Sayres asked Mr. Fahey whether they would be required to pay two fees. Mr. Fahey told the Sayres that they would have to pay only one fee. Subsequently, the Sayres came to Mr. Fahey's office and entered into a fee contract with his law firm. Mr. Fahey and his law firm filed suit on behalf of the Sayres against the Tenneys, in *Sayre v. Tenney*, No. 81–C–49 R (Cir.Ct. Hancock County 1981), which resulted in a jury verdict of approximately $800,000 in August, 1982.

Mrs. Pietranton, as executrix of her husband's estate, wrote a letter to Mr. Fahey requesting her one-half share of the fee generated by *Sayre v. Tenney*. Mr. Fahey's law firm then filed a declaratory judgment action in the Circuit Court of Hancock County, seeking a determination as to the amount, if any, to which Mr. Pietranton's estate was entitled from *Sayre v. Tenney*. Mrs. Pietranton filed an answer and counterclaim seeking a judgment of $200,000, or fifty percent of the fee. Mr. Fahey's law firm moved for summary judgment, arguing that the fee-splitting agreement was unethical under DR2–107 [2] and was therefore unenforceable.

The Circuit Court of Hancock County granted summary judgment in favor of the law firm, holding that the fee agreement violated public policy since the arrangement violated DR2–107 of the West Virginia Code of Professional Responsibility.

Although Mr. Pietranton and Mr. Fahey did not execute an express fee agreement, the remuneration to Mr. Pietranton or Mr. Pietranton's estate of one-half of the fee obtained in the thirty-four or so cases prior to *Sayre v. Tenney* evidences a fifty percent fee-splitting agreement between Mr. Pietranton and Mr. Fahey.

■ DR2–107(A)(1) prohibits division of fees among lawyers unless "[t]he client consents to employment of the other lawyer after a full disclosure that a division of fees will be made." Mr. Fahey testified that the Sayres inquired whether they would be required to make any payment to Mr. Pietranton. Mr. Fahey testified that he told the Sayres that there would be only one fee for representation in the matter. The record contains no evidence that Mr. Fahey disclosed to the Sayres that a percentage of any fee obtained in the case would be paid to Mr. Pietranton.[3]

The appellant argues that the Sayres had notice of the association between Mr. Pietranton and Mr. Fahey and that consent was given by the Sayres when they signed the new contract with Mr. Fahey for his continued representation. Knowledge of the fee-splitting arrangement, however, cannot be inferred from knowledge of the association. DR2–107 requires disclosure of the fee-splitting agreement. Therefore, absent the Sayres' consent after full disclosure, an agreement to pay one half of the $400,000 fee obtained in *Sayre v. Tenney* to Mr.

---

**2.** DR2–107 states that:
(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
(2) The division is made in proportion to the services performed and responsibility assumed by each.
(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.
(B) This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

The law firm argues that the fee agreement fails to meet the "services performed and responsibility assumed" requirements of DR2–107(A)(2). Because we find that the fee agreement fails for lack of client consent under DR2–107(A)(1), we do not address the enforceability of the fee agreement under DR2–107(A)(2).

**3.** Both Royal and Kelly Sayre stated in their affidavits that "Mr. Pietranton never told us during his lifetime, who, if anyone, would help him try the case."

Pietranton's estate violates DR2–107. *See Fleming v. Campbell,* 537 S.W.2d 118, 119 (Tex.Civ.App.1976) (referral fee contract void and unenforceable unless client's consent is obtained after full disclosure).

■ Having established that DR2–107(A)(1) prohibits the fee-splitting agreement, the question, then, is whether we should allow Mr. Fahey's law firm to raise that prohibition as a bar to payment of fifty percent of the fee in *Sayre v. Tenney* to Mr. Pietranton's estate. We think not.

In Informal Opinion No. 870, the ABA Committee on Professional Ethics addressed a similar issue. There, the Committee responded to a law firm's request concerning a fee-splitting agreement between the law firm and a "forwarding attorney" under Canon 34 of the Canons of Professional Ethics from which DR2–107 is derived.[4] The letter explained that the law firm had entered into an arrangement with an attorney in a nearby community pursuant to which the law firm was to pay one-third of a fee in a case pending in the law firm's office to the attorney as "forwarding attorney." The law firm stated further that a $40,000 fee was expected and noted that the "forwarding attorney" performed no more than two percent of the work in the case. The law firm inquired whether it was bound to honor the agreement or whether it would be proper to divide the fees on the basis of a percentage of the work done.

The Committee responded as follows:

It is the decision of the Committee that the attorney should not interpose as a reason for not carrying out the agreement he made that the agreement was not ethical. This matter of ethics should have been recognized and adhered to by the attorneys before they entered into the agreement. When two lawyers have participated in an unethical agreement one of them should not, where no one else is involved, set up the unethical agreement against the other.

ABA Comm. on Professional Ethics, Informal Op. 870 (1965).

In *Foote v. Shapiro,* 6 Pa.D. & C.3d 574 (Lehigh County, 1978), a Pennsylvania court followed the ABA opinion in a case much like the one before us. In *Shapiro,* the court considered whether a contract between two lawyers is unenforceable because it, or the conduct or transaction from which it arose, violated the Disciplinary Rules of the Code of Professional Responsibility. In *Shapiro,* a client retained the plaintiff-attorney in a personal injury action. The plaintiff-attorney turned the client's file over to the defendant-attorney. At the time of the transfer, the two lawyers had an oral agreement on the division of the fee. Later, the plaintiff-attorney requested that the case be returned to him. Two years later, the client dismissed the plaintiff-attorney as his attorney and the case was once again returned to the defendant-attorney. The case was settled and resulted in a $5,000 attorney's fee. The plaintiff-attorney sued, demanding fifty percent of the $5,000 fee. The defendant-attorney moved for summary judgment, arguing that the alleged fee-splitting arrangement violated DR2–107(A) and should, therefore, be deemed void and unenforceable.

Concluding that a violation of a disciplinary rule alone will not defeat a contract between lawyers, the *Shapiro* court denied defendant's motion for summary judgment.[5]

---

**4.** *See* ABA Comm. on Professional Ethics, Informal Op. 870 (1965). Canon 34 of the Canons of Professional Ethics reads:

No division of fees for legal services is proper except with another lawyer, based upon a division of service or responsibility.

American Bar Ass'n, *Canons of Professional Ethics,* in Opinions on Professional Ethics (1967).

**5.** In addition to setting forth Informal Opinion No. 870, the *Shapiro* court noted that the Code of Professional Responsibility is not a statement

of positive law, but guidelines "to be adopted by appropriate agencies both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below the required minimum standards stated in the Disciplinary Rules." *Shapiro* at 577, quoting ABA Code of Professional Responsibility, Preamble and Preliminary Statement (1970). This observation is helpful in distinguishing "illegal" conduct from "unethical" conduct." A court of law is the appropriate forum in which to litigate the enforceability of

We agree with the reasoning of both the ABA Committee and the *Shapiro* court that a violation of a Disciplinary Rule, alone, will not defeat a contract between lawyers.[6] A lawyer or law firm which enters into and honors a fee-splitting agreement with another lawyer may not later raise DR2–107 of the West Virginia Code of Professional Responsibility as a bar to enforcement of the agreement. While we are reluctant to enforce an agreement which violates an ethical rule, we cannot view *Sayre v. Tenney* in isolation from the thirty-four or so prior cases in which the law firm honored, albeit unethically, the fifty percent fee-splitting agreement. As stated by the ABA Ethics Committee, "[t]his matter of ethics should have been recognized and adhered to by the attorneys before they entered into the agreement." Opinion No. 870, ABA Comm. on Professional Ethics, Informal Op. 870 (1965).

We, therefore, conclude that the fee-splitting agreement between Mr. Pietranton and Mr. Fahey's law firm is enforceable as between the parties notwithstanding that the agreement violates DR2–107 of the West Virginia Code of Professional Responsibility. The estate of Frank A. Pietranton, therefore, is entitled to fifty percent of the attorney's fee in *Sayre v. Tenney*.

Reversed.

NEELY, Justice concurring:

It is now time for the courts to reevaluate the "services performed and responsibility assumed" section of DR2–107 (A)(2). This rule was originally designed to prohibit lawyers' "specializing" in ambulance chasing. Without a formal rule, marginally qualified lawyers would make careers of being law-trained runners; their only function would be to visit hospitals, union halls, and funeral parlors to "inform" potential plaintiffs of their rights and encourage them to file suits.[1]

However, Mr. Pietranton's conduct was well outside anything that the rule could reasonably have been intended to proscribe. For many years Mr. Pietranton was a well regarded, general practice lawyer who was available to all who needed legal help. Like most of our general practitioners, Mr. Pietranton was not a lightning fast calculator of his clients' abilities to pay and he helped those who couldn't pay fair market value for his services. He worked in the community; he took court-appointed criminal cases; and he was active in community affairs. The result was that Mr. Pietranton was *trusted*, which was why Mrs. Sayre came to him. Trust is the cynosure of the lawyer/client relationship, and although it is intangible, it is an expensive commodity to produce.

In the world of family lawyers, the lawyer makes money when big money changes hands. Most of the routine legal matters that a family lawyer performs for clients don't generate large enough fees to pay the overhead directly associated with those matters. For most ordinary people, legal fees are unbudgeted expenses that are highly resented. This is particularly true when a lawyer must be retained to secure a right or benefit to which the client believes he is entitled anyway. Contested divorces, child custody cases, and non-support matters are prominent examples of this phenomenon.

The general availability of legal services in the community is subsidized by big personal injury suits, real estate closings when

---

an agreement between two parties. On the other hand, disciplinary proceedings before the State Bar are available to redress unethical conduct under the Code of Professional Responsibility.

6. *But cf. O'Hara v. Ahlgren, Blumenfeld & Kempster,* 511 N.E.2d 879 (Ill.App.Ct.1987) (DR3–102 prohibition of sharing fees with non-lawyer required dismissal of action to enforce widow's sale of deceased attorney's goodwill).

1. The public policy behind DR–2–107 (A)(2) is that the payment of a referral fee *could* unfairly increase the client's bill by allowing attorneys to collect payment for little or no work. *See Weil v. Neary,* 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1928); *Palmer v. Breyfogle,* 217 Kan. 128, 535 P.2d 955 (1975); *McFarland v. George,* 316 S.W.2d 662 (Mo.Ct.App.1958); *Greenwald v. Zyvith,* 23 A.D.2d 201, 259 N.Y.S.2d 387 (Sup.Ct. 1965).

bank loans pay the fees, and the settlement of estates. Thus if these subsidies supporting provision of routine legal services to individuals dry up, the whole community suffers: suddenly the world of law offices begins to look like the world of McDonalds where if you want fries, you pay for fries. That's not how I practiced law and that's not how I want law to be practiced.

Indeed, Mr. Pietranton did "perform services" and "assume responsibility," but he did those things for decades before Mrs. Sayre walked into his office. Furthermore, Mr. Pietranton had attended seminars and bar meetings, and he regularly read professional literature that allowed him to understand Mrs. Sayre's problem. Because of his expensive training, Mr. Pietranton also understood that he needed help with Mrs. Sayre's case, and he knew where to get the best help available. No one in this proceeding has asked how many women like Mrs. Sayre Mr. Pietranton listened to over the years who did *not* have cases and whom he advised free of charge. Contingent fee lawyers don't get paid for listening to clients who don't have cases; they get paid for winning lawsuits.

Furthermore, the clients themselves are ill served when general practice lawyers are required under DR 2–107(A)(2) to participate in cases for which they are untrained. The world is full of well capitalized law factories that specialize in certain types of cases: for air crash cases, you go to one law firm; for product liability cases you go to another, and for medical malpractice you go to yet another. The general practice lawyer devotes both time and attention to evaluating the abilities and qualifications of these specialists so that he can refer clients to exactly the right lawyer. That costs money and takes work; it is an office overhead expense.

When a family lawyer who does not understand air crash cases is required to participate in an air crash case's trial to share the fee, he is freight and not power for the specialist. Furthermore, too narrow a reading of DR2–107(A)(2) can lead to one of two possible results, both of which are bad: First, a lawyer who needs the fee may try to do a case for which he is either unqualified or undercapitalized himself and, as a result, may badly bungle the client's case. Second, an unqualified lawyer may insist on "helping" a specialist, and either cause the specialist unnecessary work, or cause the specialist himself to bungle the case. Who wants a novice helping in the trial of a multi-million dollar case?

Finally the client does not pay for services not received.[2] The specialist law firms do not need to waste overhead and manpower picking through and sorting out cases and clients. The general practice lawyers understand the difference between a pearl and a stone, which means that the specialists can devote their undivided attention to the energetic litigation of pearl-like cases. Why shouldn't the general practice lawyer be given credit for all the stones he has politely and carefully sorted? Much of the work of these family lawyers amounts, as in this case, to assessing litigability. Custom and usage is that the big, special-

**2.** In the June, 1978, Report of the Roscoe Pound–American Trial Lawyers' Foundation, the recommendation was set forth that DR2–107(A)(2) be eliminated. The effect of such a move would be to legalize referral fees. The Foundation asserted that there is little or no evidence that a client will pay a higher fee for legal services rendered under a fee-splitting arrangement. Most arrangements occur in the areas of contingent fee/personal injury litigation where the contingent fee would be the same regardless of fee-splitting. Roscoe Pound–Am. Trial Lawyer Found., Ann. Chief Justice Earl Warren Conf., *Ethics and Advocacy, Final Report,* note 6 at 18 (June 23, 24, 1978).

DR–2–107 as it now stands does very little good. It is frequently violated and the violators are rarely censured. The effect has been to encourage those attorneys who desire referral fees to forward cases to attorneys *who are known to pay referral fees* rather than to attorneys who are known to be competent in the specific area. As a result, although legalizing referral fees may increase their use, the overall effect will be to help the client by encouraging the referring attorney to forward the case to the lawyer most likely to get the largest recovery. Legalizing referral fees would actually benefit the client by giving lawyers the incentive to refer their contingent fee clients to the most competent lawyers. *See also* Carter, Lewis. "Attorneys: The Referral Fee: A Split in Opinion." 33 Oklahoma Law Review 628, 631 (1980).

ized, well-capitalized firms charge contingent fees amounting to one third of whatever the client recovers—exactly what the most notoriously, incompetent hack would charge. Of this fee, the specialist regularly gives one third to the family lawyer who has forwarded the case. The client loses nothing!

Thus, although I concur in the majority's holding, I also believe that under any intelligent reading of DR2–107(A)(2) Mr. Pietranton did a lot of work for his fee. There is no evidence that the client paid a higher fee because of the fee-splitting arrangement, which means that under established custom and usage a Pareto optimum is achieved: everyone is made better off without anyone's being made worse off. And this is the system that we should not only condone, but encourage.