[No. 36875.   Department One.   April 16, 1964.]

NED W. KIMBALL et al., Respondents, v. PUBLIC UTILITY DISTRICT No. 1 OF DOUGLAS COUNTY, Appellant.*

*Reported in 391 P. (2d) 205.

*Earl K. Nansen* and *Richard G. Jeffers,* for appellant.

*Jerome Williams* and *Cashatt, Williams, Connelly & Rekofke,* for respondents.

HALE, J.—Plaintiffs claimed $42,000 in attorneys' fees from defendant Public Utility District No. 1 of Douglas County. The P.U.D. says that plaintiffs were paid in full measure for all professional services performed. From judgment on a jury verdict rendered in a neighboring county awarding plaintiffs exactly $42,000, the P.U.D. appeals.

Ned W. Kimball, admitted to the practice of law in 1938, and C. M. Clark, admitted in 1946, had an informal partnership but maintained separate offices, with Kimball in Waterville and Clark in Coulee City. In 1955, the P.U.D., then operating only a small distribution system, engaged Mr. Kimball to act as its attorney on a modest monthly retainer, and a year or more later Mr. Clark joined him in the arrangement. The P.U.D., at the time, had only occasional need for professional services of its attorneys, usually consulting them on minor problems.

But the P.U.D. nurtured ambitions to build a great dam on the Columbia for the generation of electric power—ambitions once abandoned, but now revived. It asked plaintiff attorneys to renew an earlier program designed to create a generating system called the "Wells Hydroelectric Project." It employed the attorneys to get on with the complex legal business upon which success of the project depended,

a professional employment necessarily surrounded by complicated engineering, hydraulic, geological and financial problems. But we are not here concerned with the technical, scientific and financial aspects of this gigantic project, and, accordingly, proceed directly to the contract for professional services out of which this case arises. The terms of the agreement are not in dispute.

In August, 1958, under a contract with the P.U.D., Bechtel & Company, an engineering and construction firm of San Francisco, submitted to the P.U.D. a comprehensive feasibility report based on scientifically performed engineering and geological studies. It pronounced the project feasible, from both a revenue and an engineering standpoint; and it estimated the cost of construction at $135,690,500, exclusive of expenses for legal services and administration, and interest on bonds during construction. Total costs of the completed project were calculated at $160,000,000.

Following delivery and study of the Bechtel feasibility report, the board of three commissioners of the P.U.D.—one member dissenting—employed plaintiff attorneys, Kimball and Clark, to perform all necessary legal services in connection with the promotion and construction of the Wells Hydroelectric Project on the Columbia River. The P.U.D. agreed to pay plaintiffs $1,500 per month until such time as the project was fully authorized and the revenue bonds necessary to assure completion were sold. Upon final authorization and sale of the necessary revenue bonds and the assurance of completion of the project, the P.U.D. agreed to pay to the plaintiffs a fee of $130,000, less the amount already paid them in the $1,500 monthly remittances.

To describe the contract otherwise, in exchange for counsel's professional services toward consummation of the Wells Project, the P.U.D. promised to pay them a total fee of $130,000 upon completion with payments of $1,500 per month to apply thereon. If at any time it appeared certain that the project could not be undertaken or brought to completion, the contract for professional services thereupon ended, and the $1,500 per month payments would cease. Apparently, both parties to the agreement were satisfied

that the project would be assured either of completion or abatement long before the $130,000 fee had been paid at the rate of $1,500 per month.

Plaintiffs entered upon performance of the contract February 1, 1959. Twenty-two months later, following a change in the membership of the P.U.D. board of commissioners through an election, the retainer contract was terminated by formal resolution and notice. The attorneys assert $75,000 to be the reasonable value of their services to the P.U.D. in advancing the Wells Hydroelectric Project, on which they have received $33,000 through the $1,500 retainer; thus, they claim a balance due them of $42,000. The retainer agreement also provided that the P.U.D. would reimburse the attorneys for all out-of-pocket expenses specially incurred by them on the Wells Project, such as expenditures for travel, hotels, meals, mileage and other necessary costs. This latter provision is important only for the reason that it provided a documentary basis to substantiate some of the time charged by the plaintiffs to the Wells Project.

The P.U.D. argues that its $1,500 per month payments fully compensated the attorneys for all services performed during the 22-month period and that recovery on quantum meruit does not lie because plaintiffs, for want of daily time records, are unable to prove the precise number of hours spent at this task. The district says that, to allow recovery here in excess of the $1,500 per month, places it at the mercy of the unsupported, vaguely established, claims of its own attorneys. In short, it asserts that, in the absence of proof by daily diary of time and efforts spent, the evidence is insufficient as a matter of law to support recovery quantum meruit.

We do not read the contract between attorneys and client to support appellant's position. The arrangement promised professional services until the day the services would no longer be needed to advance the project for a promised fee of $130,000, or, in the alternative, $1,500 per month until the district was satisfied that the project could not be undertaken. The agreement contemplated retaining plaintiffs as counsel until one point or the other had been reached—

either assurance of consummation of the project or certainty of its abandonment. Regardless of the time and effort put in by them, when the project was assured of completion by sale of the revenue bonds, plaintiffs were to receive a fee of $130,000, or $1,500 per month until the district should earlier come to the conclusion, for one reason or another, that the project would never reach the point where the revenue bonds were marketable.

There being no duty express or implied then that the plaintiffs maintain daily time records on the Wells Project, they came within the familiar rule that they were obliged to prove both their services performed and the reasonable value thereof by a preponderance of the evidence in the same way that any other claim for services quantum meruit is proved. Kimball testified, by means of cross references to the monthly expense vouchers regularly submitted to, approved and paid by the appellant, that during the 22-month period he had devoted 107 days to the Wells Project. Clark showed 91 full days by the same reference. These vouchers supported evidence of trips undertaken by the attorneys on behalf of the project to New York, Washington, D.C., Seattle and Portland.

In addition, Kimball stated that he spent at least 2 hours of his office day on the project for a total of 830 hours; and Clark, by estimating his average daily time in the office working on Wells, figured 324 hours. Mrs. Lola Rinker, legal secretary and formerly employed by plaintiff Kimball in his office during the 22-month period, estimated that 75 per cent of his time in the office was spent by him on legal affairs of the Wells Project, and she said that Mr. Clark frequently spent hours of office time in Waterville doing the same. Mr. Merton Dick, formerly Douglas County Assessor and part-time auditor of the P.U.D., said, likewise, that the plaintiffs devoted a great deal of time to the Wells Project.

Mr. Del Cary Smith, called by plaintiffs as a professional expert, testified that he had been admitted to the bar in 1925, served as President of the Spokane County Bar Association, President of the Washington State Bar Association, and as a member of the Board of Governors of the Wash-

ington State Bar Association. He found the amount claimed to be reasonable in view of the time spent, the magnitude of the project involved, and the experience of the plaintiffs as counsel. Mr. J. D. McCallum, a member of the bar of this state since 1913 with offices in Davenport, applied the factors mentioned in Canon of Professional Ethics 12, RCW Vol. 0, as a guide to fixing of attorney's fees, and, likewise, expressed his opinion as an expert that the amount claimed by counsel for the time spent and professional services rendered by them on the project was reasonable. Both lawyers were cross-examined skillfully and effectively.

From the facts briefly outlined above, did plaintiffs submit sufficient evidence to warrant the verdict?

■ Canon of Professional Ethics 12, RCW Vol. 0, mentions many cogent factors to be weighed in considering fees. We agree that it appropriately describes the determinants upon which reasonableness of the fee may be assessed. Such factors as the time and labor required, difficulty and complexity of the problems encountered, the amount, size and benefits to accrue from the controversy, the experience of the lawyers, and the customary charges of the bar for similar services—together with the other considerations mentioned—all are strong, though not controlling, guides in ascertaining the true value of professional services.

■ A client may, at any time, either for good or fancied cause, or out of whim or caprice, or wantonly and without cause whatever, discharge his attorney and terminate the attorney-client relationship. 5 Am. Jur., Attorneys at Law § 172. This rule, though a harsh and stringent one against the attorney, exposing him frequently as it does to undeserved censure and criticism, is thought necessary for the protection of the client in particular and the public in general.

But a necessary and rightful corollary to this rule which permits the client to discharge his attorney without good cause, is the obligation implied in law to pay the attorney a reasonable fee for the services he has rendered to the client up to the time the attorney-client relationship is terminated.

We expressly declared this rule in *Ramey v. Graves,* 112 Wash. 88, 191 Pac. 801, but disallowed recovery there because the attorney made no showing of the reasonable value of his services up to the time of his discharge. Similar are *Cavers v. Old Nat. Bank & Union Trust Co.,* 166 Wash. 449, 7 P. (2d) 23, and *Hamlin v. Case & Case, Inc.,* 188 Wash. 150, 61 P. (2d) 1287, where the rule allowing recovery for services rendered quantum meruit was declared in situations involving contingent fees, but recovery denied on other grounds.

■ We take it to be the rule, then, that, where compensation of an attorney is fixed by agreement between attorney and client and is to be paid in full upon completion of the work or undertaking for which the attorney has been engaged, if the attorney is discharged or prevented by the client from completing the work or undertaking, the measure of the attorney's damage is not the fee agreed upon for completion of the task, but reasonable compensation for the professional services actually rendered. See *Hamlin v. Case & Case, Inc., supra.*

We are satisfied from our reading of the record that the jury had ample evidence before it to support the verdict.

Appellant P.U.D. also assigns error to the court order granting plaintiffs' motion for a change of venue. Plaintiffs supported their motion with an affidavit stating that articles had appeared in the newspapers opposing their retainer agreement with the P.U.D. in Douglas and Grant counties and that nearly all of the residents of Grant County were customers of the P.U.D. They also said that the P.U.D., being subject to no supervisory rate-making body, fixed its own rates for electric power. At a hearing on the motion, appellant P.U.D. presented oral evidence by its auditor that any judgment obtained by plaintiffs in the cause would, in his opinion, be rightfully chargeable against funds set aside for the Wells Project and would not be a charge against the contemporary distribution system or its customers. Judge Felix Rea of Douglas County, in granting the motion for a change of venue, remarked:

" . . . there is interest in activities in their county.

The activities of that P.U.D. would also be in the minds of the people locally, so I am going to grant the Motion and transfer the matter for trial to Lincoln County. That is one of the adjacent counties on the east and would be one most convenient for everyone concerned to reach, I believe."

The granting or denial of a change of venue or transfer of the cause to another county rests in the sound discretion of the judge having the matter for consideration. Our statement in *Russell v. Marenakos Logging Co.*, 61 Wn. (2d) 761, 380 P. (2d) 744, that:

"We recognize, too, that a trial court must exercise its discretion on the issue of venue with reference (1) to whether an impartial trial can be had; (2) to the convenience of witnesses; and (3) to whether the ends of justice would be forwarded. Where a superior court has exercised its discretion, this court will review only on a showing of manifest abuse of discretion. . . ."

in our opinion, should govern the disposition of this assignment of error for we find nothing in the record from which transfer of the cause from Douglas to Lincoln County for trial by jury can be held to constitute an abuse of judicial discretion.

The judgment is, therefore, affirmed.

OTT, C. J., HILL and ROSELLINI, JJ., and MURRAY, J. Pro Tem., concur.

June 2, 1964. Petition for rehearing denied.