[No. 48084-2. En Banc. January 13, 1983.]

MELVIN M. BELLI, *Petitioner*, v. DONALD R. SHAW, ET AL, *Respondents*.

*Daniel U. Smith* and *Kurtz & Hurley,* by *James P. Hurley,* for petitioner.

*John Gavin* and *Rodney K. Nelson* (of *Gavin, Robinson, Kendrick, Redman & Mays, Inc., P.S.*), for respondents.

PEARSON, J.—Plaintiff Melvin Belli appeals a Court of Appeals decision affirming a judgment notwithstanding the verdict in his action for attorney fees. Plaintiff brought this action in 1977 against defendants, partners in a Yakima law firm, claiming $50,000 in attorney fees pursuant to a fee agreement allegedly made in 1959 with J. P. Tonkoff, a former partner in the Yakima firm. The jury awarded plaintiff $50,000, but the trial court entered judgment notwithstanding the verdict. The court concluded as a matter of law there was not sufficient evidence of a fee agreement which would entitle plaintiff to recover fees from defendants. The only issue before us is predominantly factual: Whether the record contains sufficient evidence to support the trial court's judgment notwithstanding the verdict. We affirm.

On May 11, 1959, a newspaper in Phoenix, Arizona, published an article critical of Wade Church, Attorney General of Arizona at that time. Shortly thereafter, Church met with plaintiff to discuss bringing a defamation action against the newspaper. Plaintiff suggested to Church that J. P. Tonkoff, an attorney from Yakima, be associated with plaintiff on the case. In December 1959, Church agreed to a contingent fee arrangement whereby he would pay one–third of any recovery as attorney fees. These fees were to be shared equally among plaintiff, Tonkoff, and an Arizona attorney to be appointed to research Arizona law. In October 1960, Philip Goldstein, an attorney in Phoenix, Arizona, was associated as local counsel.

The record indicates that most of the preparation for the trial was the work of Goldstein and Tonkoff. In March and April 1961, plaintiff's office manager requested from Goldstein status reports on the Church litigation. On April 10, 1961, the office manager wrote:

> Would you please let us know whether you have continued this case or whether or not Mr. Belli is still a participant in it so that we can close our file if the matter is dead.

Goldstein responded that as far as Church was concerned Belli was still a participating attorney. The case was set for trial, but was rescheduled several times because of Belli's conflicting trial calendar. On April 10, 1963, Belli wrote Goldstein: "If you can put the case over, I will try it . . . If you can't put it over, you will have to count me out." The trial began on April 29, 1963. Belli did not attend the trial, but sent his partner, Richard Gerry. Gerry was instructed by Belli that if Goldstein and Tonkoff tried the case, he was not to sit in on the case with them. Realizing that Goldstein and Tonkoff had the case prepared for trial, Gerry left Phoenix.

The jury returned a verdict for Church in the amount of $50,000. The defendant newspaper appealed. On November 24, 1968, the Supreme Court of Arizona reversed the trial court's decision and remanded the case for a new trial.

Belli testified in the present case that from 1963 through 1968 he made no offers of advice or citations of authority to either of the two participating attorneys. Correspondence between Goldstein and Tonkoff with Church continued. On May 10, 1967, Tonkoff wrote to Goldstein advising him of the status of the Church case:

At the time I was introduced to this case and requested to sit in with Mel, Mel advised me that he had a contingent fee contract with Wade [Church] for one–third and that Wade would secure his own local counsel. This, of course, has been altogether abrogated since you and I have done all of the work.

I am enclosing a copy of my contingent fee contract which provides for one–third if the case is not appealed and 40% if appealed and client pays all of the out–of–pocket expenses . . .

Whatever your judgment is, I will be entirely satisfied. I don't know how we are going to handle the Belli situation, but we will talk about that later.

The record contains no indication that Belli and Tonkoff ever discussed this new fee arrangement.

On January 2, 1974, Goldstein wrote to Belli informing him of the new arrangements:

Shortly prior to commencement of the second trial, in the Spring of 1971, Church, Peter and I discussed arriving at a firm financial arrangement. At that time it was agreed that Church would pay a 40% contingent fee on the gross amount recovered to Peter and myself, plus reimburse our office for the costs advanced. Peter and I, in turn, agreed to share equally in the fee, if paid. At that time, there was no discussion regarding the payment of any fee to your office, except Pete's remarking that he would talk to you at some future date.

On January 15, 1974, Belli's office manager, on Belli's behalf, responded to Goldstein's letter concerning the new agreement between Goldstein, Tonkoff, and Church and explained, "we had an arrangement with Peter Tonkoff of ⅓ forwarding fee on any cases between us."

In neither the correspondence admitted into evidence nor his testimony in the present case does Belli dispute the

existence of the new fee agreement between Church, Goldstein, and Tonkoff. Plaintiff testified, however, that the usual one–third forwarding fee arrangement referred to in the letter of January 15, 1974, was modified in the Church case to provide plaintiff with a one–half forwarding fee.

In June 1971, after the second trial, the jury awarded Church damages of $485,000. Neither Belli nor any of his associates took part in this second trial or the subsequent appeals.

In 1976, after the defendant newspaper had exhausted its appeals, Goldstein received a check for $625,872 in satisfaction of the judgment, plus interest. From this sum, $253,000 was deducted for attorney fees. Goldstein kept $153,000 pursuant to his agreement with Tonkoff's law firm. The remaining $100,000 was sent to Donald Shaw and Walt Dauber, surviving partners of the now deceased Tonkoff.

In May 1976, Church sent Goldstein a release of judgment. Church signed this release on the condition that one–half of the attorney fees be set aside until there was a "complete release from the estate of Peter Tonkoff and/or Mel Belli," and on the additional condition that Goldstein hold Church harmless from payment of any additional attorney fees.

In 1977, in an action against Goldstein for attorney fees from the Church defamation action, plaintiff stipulated that:

Melvin M. Belli makes no claim against Philip T. Goldstein or against Wade Church for the attorney's fees which are the subject of this action.

It is further stipulated that this stipulation will not prejudice or in any way affect any claim Melvin M. Belli may have against Walter B. Dauber and/or Donald R. Shaw for their share of the attorney's fees which are the subject of this action.

Belli claimed 50 percent of the $100,000 paid to Tonkoff's firm. Shaw refused to pay, and Belli brought this action to recover the $50,000.

The jury returned a verdict for Belli in the amount of $50,000. The trial court granted judgment notwithstanding the verdict, holding there was insufficient evidence, as a matter of law, that a contract existed between Tonkoff and Belli relating to the distribution of attorney fees.

The trial court also determined that even if such an agreement existed between Belli and Tonkoff, it could only be a "referral" or "finder fee" which would not be enforced by Washington courts. On appeal, this decision was affirmed by Division Three in *Belli v. Shaw*, 29 Wn. App. 875, 631 P.2d 980 (1981).

We articulated the standard of review that we apply to judgments notwithstanding the jury's verdict in *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

A motion for a judgment n.o.v. should not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict. All evidence must be viewed in the light most favorable to the party against whom the motion is made. *Grange v. Finlay*, 58 Wn.2d 528, 364 P.2d 234 (1961). There must be "substantial evidence" as distinguished from a "mere scintilla" of evidence, to support the verdict—*i.e.*, evidence of a character "which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed." A verdict cannot be founded on mere theory or speculation. *Arnold v. Sanstol*, 43 Wn.2d 94, 98, 260 P.2d 327 (1953).

This is the standard we apply in the case before us. We must determine whether there is "substantial evidence" from which the jury could have concluded that defendant had an enforceable agreement under which he was entitled to share in the fees from the Church defamation case. The task is not easy, for the history of nearly 20 years of litigation must be pieced together from plaintiff's testimony and from the correspondence and other papers culled from the files of several attorneys. In all this material, however, we find no substantial evidence to sustain the jury's verdict; no evidence, nor even any reasonable inference therefrom, suggests that plaintiff had an enforceable fee agreement at

the time he began this suit.

There is undisputed evidence that in December 1959 Church agreed to a contingent fee arrangement whereby he would pay one–third of any recovery as attorney fees. These fees were to be shared equally among plaintiff, Tonkoff, and an Arizona attorney to be associated at a later date. Goldstein was associated as local counsel in 1960. The fee arrangement between Church and plaintiff, Tonkoff, and Goldstein continued in effect at least until the conclusion of the first trial in 1963.

Plaintiff's efforts up to the conclusion of the first trial comprised opening a new file, reviewing the file and the allegedly libelous article, analyzing the complaints and answer, performing some research and analysis of libel cases, discussing the case with Tonkoff, meeting three times with Church, and reviewing jury instructions. Plaintiff did not participate in the trial. His partner was apparently prepared to attend the trial but found it unnecessary to do so. After the trial, plaintiff reviewed the transcript of proceedings and briefs on appeal.

There is further undisputed evidence that, between the first and second trials, the original contingent fee agreement was replaced with a new agreement which excluded plaintiff from a share of the fees. The first reference to the new agreement is in the letter of May 10, 1967, from Tonkoff to Goldstein. This letter declares that the initial, arrangement "has been altogether abrogated" because Tonkoff and Goldstein had "done all of the work." Almost 7 years later, in a letter dated January 2, 1974, Goldstein informed plaintiff of the new fee arrangement. In this letter, Goldstein stated that Church agreed to the new arrangement shortly before the second trial began in the spring of 1971.

Plaintiff did not dispute the existence of the new agreement. Instead, he asserted a "forwarding fee" arrangement with Tonkoff as the basis of his claim for fees. In his letter of January 15, 1974, responding to Goldstein's of January 1, 1974, plaintiff asserted that the forwarding fee was one–

third of Tonkoff's share of the fees. On the stand in the present litigation, plaintiff testified that the forwarding fee in the Church case was one-half of Tonkoff's share. Nowhere does plaintiff allege that he was entitled to a full one-third share of the fees under the 1959 agreement. Rather, his position consistently has been that he is entitled to a percentage of Tonkoff's half of the fees.

Two formal documents executed after the second trial are consistent with plaintiff's position. First, the release signed by Church in May 1976 provided that Goldstein was to receive one-half of the agreed fee and the other half was to be set aside until there was a release from Tonkoff's estate "and/or" plaintiff. Had the original agreement been in effect, Church would have been obligated to set aside one-third each for Tonkoff and plaintiff. The second document is plaintiff's 1977 stipulation that he would make no claim for fees against Goldstein, and would limit his claim for fees to defendants' share. This stipulation is consistent with plaintiff's position that he was entitled to fees only through his forwarding fee arrangement with Tonkoff.

Moreover, plaintiff's involvement in the Church litigation after the first trial was negligible. After the first trial, plaintiff's contributions to the litigation were limited to casual references to the matter in correspondence, informal requests for progress reports, and references to the case in conversations with Tonkoff, a personal friend of plaintiff. In a letter of March 24, 1975, to defendants Shaw and Dauber, plaintiff made some apparently gratuitous suggestions for expediting the Arizona Supreme Court's review of the case, and offered to review the briefs for new issues which might have been raised. There is no evidence that defendants took plaintiff up on this offer. This involvement, minimal at most, is quite consistent with the explicit evidence that plaintiff's only claim was for a forwarding fee.

■ In sum, therefore, we conclude that there is undisputed evidence that in 1971, before the second trial, Church entered into a contingent fee agreement with Goldstein and Tonkoff. This new agreement, which excluded plaintiff,

was, as a matter of law, a direct repudiation by Church of his contract with plaintiff, and constituted a discharge of plaintiff from employment.[1] Unlike general contract law, under a contract between an attorney and client, a client may discharge his attorney at any time with or without cause. *Kimball v. PUD 1*, 64 Wn.2d 252, 391 P.2d 205 (1964). Ordinarily, no special formality is required to discharge an attorney and any act of the client indicating an unmistakable purpose to sever relations is sufficient. *Thomas v. Thomas*, 178 Misc. 349, 34 N.Y.S.2d 320 (1942). Employment of other counsel, which is inconsistent with the continuance of the former relationship, shows an unmistakable purpose to sever the former relationship. *In re Estate of Schafer*, 39 Pa. Super. 384 (1909).

The undisputed evidence shows, therefore, as a matter of law, that Church's contract with plaintiff was repudiated by 1971. There is no evidence that Church entered into any new arrangement with plaintiff.

■ Plaintiff's claim for fees could be based, therefore, only upon the "forwarding fee" arrangement with Tonkoff. This arrangement violated the Code of Professional Responsibility DR 2–107, which places several limitations on such fee splitting agreements.[2] These limitations include the requirements that the fee splitting agreement have the consent of the client following full disclosure, and that the fees be shared in proportion to the services performed by each lawyer. In the present case, there is no evidence that Church authorized plaintiff's continued participation in the case after the first trial. Moreover, plaintiff's involvement in the case after the first trial was minimal at most. Not by

---

[1] An attorney discharged before completion of the undertaking for which he was engaged may recover from his client reasonable compensation for the professional services actually rendered. *Kimball v. PUD 1*, 64 Wn.2d at 258. Whether plaintiff may maintain such a quantum meruit claim against Church is, of course, not before us in this case.

[2] The arrangement also violated Canon 34, the predecessor of CPR DR 2–107. *See Hansen v. Wightman*, 14 Wn. App. 78, 94 n.5, 538 P.2d 1238 (1975); ABA Comm. on Professional Ethics, Informal Op. C 723 (1964).

any reasonable inference could plaintiff's efforts be considered equivalent to the efforts of Tonkoff and Goldstein. The forwarding fee agreement violated CPR DR 2–107 and is therefore against public policy. *Palmer v. Breyfogle,* 217 Kan. 128, 535 P.2d 955 (1975). Such an arrangement will not be enforced by the courts. *Wright v. Corbin,* 190 Wash. 260, 67 P.2d 868 (1937). It cannot, therefore, provide a basis for the jury's verdict.[3]

There being no substantial evidence to support the jury's verdict, the trial court was correct in granting judgment n.o.v.

The Court of Appeals is affirmed.

WILLIAMS, C.J., and STAFFORD, UTTER, BRACHTENBACH, and DOLLIVER, JJ., concur.

DORE, J. (dissenting)—I believe the record contains sufficient evidence to support the jury's verdict for Belli. I would reverse the trial court's judgment notwithstanding the verdict and remand for a reinstatement of Belli's judgment.

## I

Where there is a challenge to the sufficiency of evidence, including a judgment notwithstanding the verdict, this court has said that such challenge

---

[3]The dissent suggests that the recovery from Tonkoff's successors in this case can be justified on a quantum meruit theory. The dissent admits that we do not know whether the jury was given a separate instruction on the quantum meruit theory of recovery. However, the dissent "presumes" that such an instruction was given because of the type of evidence presented by Belli. Dissent, at 581. We prefer to adhere to the rule that "cases on appeal will be decided only from the record". *State v. Wilson,* 75 Wn.2d 329, 332, 450 P.2d 971 (1969). This rule requires us to limit our decision to issues which the record demonstrates were presented to the jury. The record before us does not demonstrate that the quantum meruit issue was presented to the jury. At most, it demonstrates that there might be substantial evidence to support a verdict, had that issue been presented. The dissent's remarkable reasoning would lead to the result that the issues on appeal are not limited by the issues actually presented to the jury, but only by an appellate court's creativity in devising theories for which it can find substantial support in the fragment of record before it. We cannot agree with such a result.

admits the truth of the opponent's evidence and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in a light most favorable to the opponent. No element of discretion is involved. Such motions can be granted only when the court can say, as a matter of law, there is no substantial evidence to support the opponent's claim.

*Bell v. Hegewald,* 95 Wn.2d 686, 689, 628 P.2d 1305 (1981), quoting from *Powers v. Hastings,* 93 Wn.2d 709, 713, 612 P.2d 371 (1980). The term "substantial evidence" is defined as "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Powers,* at 713; *Holland v. Boeing Co.,* 90 Wn.2d 384, 390–91, 583 P.2d 621 (1978); *In re Snyder,* 85 Wn.2d 182, 185–86, 532 P.2d 278 (1975).

In *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872 (1974), this court explains its reluctance to overturn jury verdicts at the appellate level:

As we have said on so many occasions, this court will overturn a jury's verdict only rarely and then only when it is clear that there was no substantial evidence upon which the jury could have rested its verdict. This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. . . . The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.

(Citations omitted.) In the present case, the jury held for plaintiff but it did not specify whether it based its judgment on the contract theory, the quantum meruit theory, or both.

There was substantial evidence before the jury to find either a written or an oral contract between Belli and Tonkoff. On October 5, 1959, Church forwarded copies of the libel file including a complaint and further information to

Belli and Tonkoff, indicating that Belli would take charge of the case and Tonkoff would be his assistant. Belli testified that at this point he assumed responsibility for the litigation. Belli's letter of December 15, 1959, sets out the proposition that the attorneys would take as their fee one-third of any recovery, to be split equally between Belli, Tonkoff and any local Arizona counsel. In response to Tonkoff's April 21, 1962, request for information regarding what fee arrangements had been made, Church sent Tonkoff a copy of the earlier correspondence between Belli and Church. On May 10, 1962, Tonkoff sent a copy of this letter to Belli and also sent a letter to Church indicating that the earlier agreement between Church and Belli was agreeable to him. Certainly there is substantial evidence to support Belli's claim under the written contract.

Belli, who did not appear at trial, testified that he sent his associate, Mr. Gerry, to Phoenix to try the case. There is no support in the record for the majority's conclusion that "Gerry was instructed by Belli that if Goldstein and Tonkoff tried the case, he was not to sit in on the case with them." Majority, at 571. Gerry and Tonkoff both participated in in-chamber conferences with the trial judge and opposing counsel prior to the commencement of the trial. The three attorneys between themselves agreed that tactically it should not appear to the jury that Church had three attorneys while the defendant had only one. For that reason, Gerry was present at the start of the trial, but left shortly thereafter.

The defendant newspaper appealed the judgment for Church, and the Supreme Court of Arizona set this judgment aside in 1968. Before the Supreme Court opinion was released, Belli conferred with Tonkoff on the appropriate action to take to speed up the appellate process. Belli referred Tonkoff to specific recently decided cases, which Tonkoff then used to elicit a response from the appellate court.

I am not persuaded by Shaw's argument that even if a contract existed, it was abandoned shortly before the first

trial. If the jury found an abandonment of the contract had occurred, this would result in a failure of consideration, thus discharging any obligation of Tonkoff under the agreement. 1 S. Williston, *Contracts* § 119A (3d ed. 1957). Shaw bases his abandonment argument on Belli's letter of April 10, 1963, stating that "If you can put the case over, I will try it. . . . If you can't put it over, you will have to count me out". While this statement might be interpreted as an abandonment of the contract by Belli, it may also be interpreted as a statement that if the trial itself cannot be postponed, Belli could not be present during the trial. The jury apparently chose to adopt the latter interpretation in returning a verdict in Belli's favor. There is enough ambiguity in this written statement for the jury to reach this conclusion. This court is bound by the jury's factual determination of this issue.

Even if the jury did not find the written agreement to be a binding contract, there was sufficient evidence to support the jury award under a quantum meruit theory. Where two attorneys engage in the prosecution of a cause for a contingent fee, without any other agreement, they may be held to share equally in case of success. *Brauns v. Housden,* 195 Wash. 140, 145, 79 P.2d 981 (1938). We have previously labeled the relationship created and existing between parties engaged in prosecuting or defending a particular lawsuit a special or limited partnership. *Swanson v. Webb Tractor & Equip. Co.,* 24 Wn.2d 631, 648, 167 P.2d 146 (1946). We do not know if the jury was given a separate instruction on the quantum meruit theory of recovery, as neither party brought up that part of the record on appeal. Based on the type of evidence presented by Belli, I presume a separate quantum meruit instruction was given.

There was substantial direct and inferential evidence for the jury to award Belli that part of the attorney fees to which they found him entitled by virtue of the services he performed. Belli testified that he analyzed Church's complaint and the answer, did research and analyzed current libel cases, met with Church on various occasions to discuss

the case, reviewed proposed jury instructions, interviewed character witnesses in Phoenix and discussed the case at least twice a month with Tonkoff and/or Dauber. There was sufficient evidence to support the jury's verdict in favor of Belli, whether based on a written contract or a quantum meruit claim, for reasonable recovery for services rendered. I would have, therefore, declined to overturn the jury's verdict.

## II

The trial court concluded Belli had failed to render performance, and any agreement between Belli and Tonkoff was based on an unenforceable "referral" or "finder" fee theory. Implicit in the jury's verdict for Belli is the finding that he performed sufficient services under the written contract for a quantum meruit recovery. Because I would hold there was substantial evidence to support the jury's verdict, it is not necessary for me to address the issue of whether the agreement between Belli and Shaw was a referral. I am troubled by the majority's analysis on this subject, however, and will comment at this time. CPR DR 2–107 provides:

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office unless:

(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) *The division is made in proportion to the services performed and responsibility assumed by each.*

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

(Italics mine.)

ABA Comm. on Ethics and Professional Responsibility, Informal Op. C 723 (1964) states:

In Opinion 204 the Committee held that it would not measure the proportion of service or responsibility or apportion fees between the attorneys. . . .

. . .

The Committee believes that Canon 34 [predecessor of

CPR DR 2–107] should be followed in all cases. It disapproves of the practice of a forwarding attorney receiving a one–third, or any other division of fees, solely for forwarding a claim to another attorney. In this case the forwarding attorney has done some work and is presumably going to continue to assume responsibility in the cases. Therefore, he would be entitled to a fee within the provisions of Canon 34.

This "hands–off" policy is based upon the fact that it is difficult to measure such intangibles as experience, expertise and geographical proximity which factor into a decision on how to split attorney fees. When a fee splitting arrangement is entered into, "fees are then to be divided in proportion to the work performed and the responsibilities assumed, and the total fees charged must not clearly exceed the reasonable compensation for all legal services performed". *Hansen v. Wightman,* 14 Wn. App. 78, 95, 538 P.2d 1238 (1975); H. Drinker, *Legal Ethics* 186–88 (1953). Therefore, assuming there is enough evidence to suggest that the attorney did more work than merely refer the case to another attorney, any division of fees will not be questioned so long as the total fees charged do not clearly exceed the reasonable compensation for all legal services performed.

In the present case, the total fee charged does not appear unreasonable considering the time span of the case, two trials, and the lengthy appellate process. Because there is substantial evidence supporting Belli's position that he rendered considerable legal services, I would decline to question the division of fees agreed upon.

I would reverse and remand for a reinstatement of plaintiff Belli's judgment.

ROSELLINI and DIMMICK, JJ., concur with DORE, J.