[No. 55087-5. En Banc. March 2, 1989.]

FREEMAN ALLARD, ET AL, *Respondents*, v. FIRST INTERSTATE BANK OF WASHINGTON, N.A., *as Trustee, Appellant.*

*Davis, Wright & Jones,* by *Richard A. Derham* and *Slade Gorton,* for appellant.

*Edwards & Barbieri,* by *Malcolm L. Edwards* and *Charles K. Wiggins; Paul N. Luvera, Jr.; Bogle & Gates,* by *Kimberly W. Osenbaugh,* for respondents.

[As amended by order of the Supreme Court May 26, 1989.]

CALLOW, C.J.—First Interstate Bank (Bank) challenges the trial court's award of attorneys' fees to plaintiffs. The Bank contends that the trial court erred by relying on the terms set forth in a contingent fee agreement between plaintiffs and their attorney and erred by awarding fees based on an hourly rate in addition to those based on the contingent fee agreement. We uphold the trial court's award.

I

In 1979, the plaintiffs brought suit against Pacific National Bank, defendant's predecessor, alleging a breach of the Bank's fiduciary duty in the management of two trusts. Plaintiffs contended that the Bank failed to obtain a reasonable price when it sold property in downtown Seattle owned by one of the trusts. The Bank prevailed at trial, and the plaintiffs appealed. This court reversed, in *Allard v. Pacific Nat'l Bank,* 99 Wn.2d 394, 663 P.2d 104 (1983), and remanded the case to the trial court for a determination of damages and attorneys' fees.

On remand, the trial court awarded approximately $2.5 million in damages to the plaintiffs. The court also awarded approximately $1 million in attorneys' fees. These fees included an award of approximately $225,000 to the firm of Oles, Morrison & Rinker, et al, which handled the initial trial and appeal. Additionally, the court awarded approximately $750,000 in attorneys' fees for the second trial. These fees included a contingent fee of $596,646 to the firms of Paul Luvera and Associates and Mullavey, Prout, Grenley, Sonkin & Foe, plus $80,000 in fees payable based on an hourly rate to the firm of Edwards & Barbieri for the services of Charles Wiggins and $65,000 in fees to the guardian ad litem.

The Bank has paid all of the attorneys' fees assessed against it with the exception of the $596,646 contingent fee.

The Bank asserts that the trial court erred in giving consideration to the contingent fee agreement between plaintiffs and Mr. Luvera when awarding attorneys' fees. Additionally, the Bank contends that the $80,000 paid to Edwards & Barbieri should be deducted from this figure. The Bank appealed the award of attorneys' fees to the Court of Appeals, which certified the following questions to this court:

1. Whether the trial court may rely on a contingent fee agreement between the prevailing party and its attorney in computing and awarding a reasonable attorney fee?

2. Whether the trial court may award attorney fees charged at an hourly rate in addition to the fees awarded based on a contingent fee agreement?

## II

Both the Bank and the Court of Appeals have framed the issues in terms of the propriety of the trial court's reliance on the contingent fee agreement and the award of hourly fees in addition to those awarded under the agreement. However, the issue should be framed as to whether the trial court's award of attorneys' fees, as a whole, was reasonable.

■■ RCW 4.84.020 provides that, "in all other cases in which attorneys' fees are allowed, the amount thereof shall be fixed by the court at such sum as the court shall deem *reasonable . . .*" (Italics ours.) *See also Singleton v. Frost,* 108 Wn.2d 723, 727, 742 P.2d 1224 (1987); *Key v. Cascade Packing, Inc.,* 19 Wn. App. 579, 585, 576 P.2d 929 (1978). The reasonableness of an award is subject to appellate review. *Key,* at 585. However, the trial court's determination of what constitutes a reasonable award will not be reversed absent an abuse of discretion. *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 64, 738 P.2d 665 (1987); *Meyer v. UW,* 105 Wn.2d 847, 856, 719 P.2d 98 (1986); *Allard v. Pacific Nat'l Bank,* 99 Wn.2d 394, 407, 663 P.2d 104 (1983). "A trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons." *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 77, 684 P.2d 692 (1984). Also, "[a]n abuse of discretion exists only where no reasonable person would take

the position adopted by the trial court." *Singleton,* at 730 (quoting *Wilkinson v. Smith,* 31 Wn. App. 1, 14, 639 P.2d 768 (1982)).

In this case, the trial court considered three primary factors in determining the amount of attorneys' fees to be awarded: (1) RPC 1.5(a), (2) the contingent fee agreement between plaintiffs and their attorney, and (3) the court's belief that the plaintiffs should be made whole. A finding of fact states:

> The court has reviewed the fees and costs incurred and the contingent fee arrangements in light of the factors in RPC 1.5(a). The court has also observed Mr. Luvera's conduct of the case as lead counsel, the result obtained, and the beneficiaries' financial inability to retain counsel on an hourly fee arrangement, and finds $596,646 to be a reasonable award for attorney's fees and costs.

In addition, during oral ruling, the trial court stated:

> Consequently, this court rules that the Allards and the Orkneys are to be made whole and will award attorneys fees to compensate them for all of the amount of money they have paid and owed to Mr. Oles [plaintiffs' counsel during the initial trial and appeal] and all of the amount of money they owe to Mr. Luvera.

■■ The trial court acted reasonably when it considered the factors set forth in RPC 1.5(a) in determining the amount of attorneys' fees to be awarded. These factors include:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

RPC 1.5(a). We have recognized that the factors set forth in CPR DR 2-106(B), the predecessor to RPC 1.5(a), may be used as a guideline for determining reasonable attorneys' fees. *See Singleton,* at 731, *Kimball v. PUD 1,* 64 Wn.2d 252, 257, 391 P.2d 205 (1964); see also Informal Op. 88-1, *Contingent Fee Agreements in Cases Where the Court Sets a Reasonable Attorney's Fee,* Wash. State Bar News 23 (Feb. 1988).

Furthermore, the trial court also acted reasonably when it considered the contingent fee agreement between plaintiffs and their attorney in making its award. RPC 1.5(a) specifically authorizes consideration of whether the fee was fixed or contingent. *See* RPC 1.5(a)(4), (8). *Pennsylvania v. Delaware Vly. Citizens' Coun. for Clean Air,* 483 U.S. 711, 97 L. Ed. 2d 585, 596, 107 S. Ct. 3078 (1987) (*Delaware II*), impliedly authorized the consideration of contingent fee agreements in making an award of attorneys' fees. In dicta, the Supreme Court noted,

the contingency factor was meant to focus judicial scrutiny solely on the existence of any contract for attorney's fees which may have been executed between the party and his attorney. "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating that attorney's fee expectations when he accepted the case."

*Delaware* II, at 723 (quoting *Johnson v. Georgia Hwy. Express, Inc.,* 488 F.2d 714, 718 (5th Cir. 1974)).

A trial court may consider the existence of a contingent fee agreement in making its award of attorneys' fees, but should not rely solely on the terms of such an agreement in determining the amount. *See* Leubsdorf, *Recovering Attorney Fees as Damages,* 38 Rutgers L. Rev. 439, 476 (1986); Note, *Attorney's Fees—Computing a "Reasonable Attorney's Fee" Under the Civil Rights Attorney's Fees Awards Act—Cooper v. Singer,* 33 U. Kan. L. Rev. 367, 388 (1985).

The court must independently decide what constitutes a reasonable award. In a case involving condemnation proceedings, the trial court awarded attorneys' fees totaling 15 percent of the difference between the City's offer and the jury verdict, the same amount provided for in a contingent fee agreement between the condemnees and their attorneys. *See Seattle v. Seattle–First Nat'l Bank*, 79 Wn.2d 490, 487 P.2d 777 (1971). We upheld the award, stating, "The [trial] court determined that, independently of the contract between the respondents and their attorneys, a fee of 15 per cent of the difference between the city's offer and the jury's verdict was reasonable." *Seattle*, at 493. *Key v. Cascade Packing, Inc., supra,* stated in reference to a contingent fee arrangement:

Such an arrangement is perfectly valid, but it should not control the size of the burden placed on a defendant. The existence of a contingent fee arrangement between an attorney and client says nothing about the reasonableness of an award of attorney's fee granted to a plaintiff against a defendant. The attorney's fee awarded should be neither enhanced nor diminished by the presence of such an arrangement.

*Key,* at 586. The existence of a contingent fee agreement may be considered as one of several factors in making an award of attorneys' fees, but it alone is not determinative.

In this case, the trial court did not apply the contingent fee agreement mechanically to determine the amount of attorneys' fees to be awarded to the plaintiffs. The court also considered the factors set forth in RPC 1.5(a) and its intent to make the plaintiffs whole. Because the court considered several factors in making its award, we cannot say that its award of $596,646 according to the contingent fee agreement constituted an abuse of discretion.

Finally, the trial court stated its intention to make the plaintiffs whole in fashioning its award of attorneys' fees. In this case, attorneys' fees were awarded as a matter of equity, based on the Bank's breach of its fiduciary duty. The trial court stated in its conclusions of law:

This court, sitting in equity, has given due consideration to the egregious nature of the bank's breach in determining the actual amount of damages.

. . .

In order to place the trusts in the same position as if defendant bank had never breached its fiduciary duties, judgment should be entered against the defendant bank . . .

Furthermore, when we initially concluded that plaintiffs were entitled to recover attorneys' fees, we stated that "plaintiffs should be granted their request to recover *all* attorney fees expended at both the trial and on appeal . . ." (Italics ours.) *Allard*, at 407–08. For these reasons, it was within the trial court's discretion to consider making plaintiffs whole as a factor in reaching its decision.

The trial court did not abuse its discretion by considering the factors set forth in RPC 1.5(a), the contingent fee agreement, and making plaintiffs whole in making its award of attorneys' fees.

### III

The Bank also contends that the trial court abused its discretion by awarding $80,000 in hourly fees for the services of Mr. Wiggins in addition to the $596,646 awarded under the contingent fee agreement. The Bank asserts that had Mr. Luvera chosen to associate someone from the Mullavey firm, the fees awarded to that attorney would have been covered by the contingent fee agreement. Instead, by going outside the firm, the Bank has been required to pay the entire 25 percent contingent fee plus an additional $80,000 to Mr. Wiggins.

The contingent fee agreement provided that outside counsel might be required, and that such counsel would be paid on an hourly basis in addition to payment of the contingent fee. Paragraph 4 of the agreement states:

Paul [Luvera] also felt that there might be a requirement that we hire other counsel to help us as the case progresses and if that is the case, those costs would be considered expenses that would be paid by you at the time that

> the expenses are incurred. As an example, if we were assigned an Iranian Judge, Paul might want to hire an Iranian attorney to argue a particular motion to the Iranian Judge, and that would be an expense that would be paid by you. I recognize that this is a far fetched example, but I hope it illustrates the thought that Paul had.

The Bank argues that this paragraph refers to hiring outside counsel for a specific, narrowly defined purpose. In this case, Mr. Wiggins handled a large portion of the trial, and therefore, arguably, did not fall within the "Iranian counsel" exception.

As noted, the primary consideration in determining an appropriate award is reasonableness. Thus, it should not be improper per se to award fees charged at an hourly rate in addition to those incurred under a contingent fee agreement. If such an award is reasonable under the circumstances, it should be upheld. There was evidence that the plaintiffs had originally agreed to pay Mr. Luvera a 33⅓ percent contingent fee. This fee was reduced to 25 percent in consideration of the fact that outside counsel might have to be appointed. The plaintiffs assert that as a result of this reduction, the Bank saved $120,000 in fees. In addition, there was evidence that Mr. Wiggins' role was limited to research, briefing, and motions practice during much of the litigation, and his role expanded only when the Bank noted last–minute depositions of the plaintiffs' experts and made last–minute disclosures of its own expert witnesses. The plaintiffs should not have to bear the burden of the Bank's late–hour tactics, especially in light of the purpose of making plaintiffs whole. We cannot say that the trial court's award of $80,000 for fees to Edwards & Barbieri constituted an abuse of discretion.

Finally, Mr. Wiggins and the guardian ad litem have requested attorneys' fees for services rendered during this appeal. Mr. Wiggins and the guardian ad litem have complied with the requirements of RAP 18.1 by making a

request for attorneys' fees in their brief. In addition, Mr. Wiggins timely filed his affidavit for attorneys' fees and is entitled to recover attorneys' fees in the amount of $23,663.30 for the work he has done on appeal, pursuant to RAP 18.1. We also award the guardian ad litem attorneys' fees of $2,970.

## IV

In fashioning the award of attorneys' fees, the trial court considered the factors set forth in RPC 1.5(a), the contingent fee agreement between the plaintiffs and their attorney, and the court's stated intent to make plaintiffs whole. The Bank challenges the award of fees based on the contingent fee agreement and the additional $80,000 awarded to Charles Wiggins. We conclude that this award is not unreasonable and did not constitute an abuse of discretion. We uphold the award of attorneys' fees.

BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and DURHAM, JJ., and CUNNINGHAM and HAMILTON, JJ. Pro Tem., concur.

DORE, J. (dissenting)—In *Allard v. Pacific Nat'l Bank,* 99 Wn.2d 394, 407–08, 663 P.2d 104 (1983), we remanded for a determination of damages for the defendant's breach of its fiduciary duties as trustee of plaintiffs' trust with instructions that "plaintiffs should be granted their request to recover all attorney fees expended at both the trial and on appeal . . ." On remand, the trial court based its award of attorney fees on an attorney fee agreement that permits counsel to collect both a contingent fee and an hourly fee for the same result. I believe such a fee agreement is unreasonable and contrary to public policy. Attorney fees based upon such an agreement amount to an unjustifiable penalty. I would disallow Wiggins' fees in the amount of $80,000, and affirm judgment on plaintiffs' contingent fee in the amount of $596,646. I would award appellant its attorney fees on this appeal.

## The Trial Court Abused Its Discretion in Basing the Fee Award on This Fee Agreement

The trial court awarded contingent and hourly fees for the same work. The court's award of attorney fees was based upon untenable reasons and constitutes an abuse of discretion. *Allard,* at 407. *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 64, 738 P.2d 665 (1987).

The Allards negotiated a contingent fee agreement under which Paul Luvera and Associates and the firm of Mullavey, Prout, Grenley, Sonkin & Foe would receive 25 percent of the gross recovery (excluding attorney fees awarded for the first trial). See Clerk's Papers, at 909. Luvera then associated Charles Wiggins and the firm of Edwards & Barbieri to act as cocounsel. Based on the fee agreement, the trial court awarded $596,646 to Luvera and the Mullavey, Prout firm as a contingent fee and awarded $80,000 to Wiggins calculated on an hourly rate.

The majority relies on the so-called "Iranian attorney" provision of the fee agreement to justify the award of both a contingent fee and an hourly fee, which in pertinent part provided:

> Paul [Luvera] also felt that there might be a requirement that we hire other counsel to help us as the case progresses and if that is the case, those costs would be considered expenses that would be paid by you at the time that the expenses are incurred. *As an example, if we were assigned an Iranian Judge, Paul might want to hire an Iranian attorney to argue a particular motion to the Iranian Judge, and that would be an expense that would be paid by you.* I recognize that this is a far fetched example, but I hope it illustrates the thought that Paul had.

(Italics mine.) Clerk's Papers, at 910.

Wiggins' services are not covered by the "Iranian attorney" provision. That provision contemplated the hiring of outside counsel for certain specific and narrowly defined purposes. Wiggins' services were extensive. He handled depositions; represented the plaintiffs at pretrial hearings;

researched, briefed and argued most of the pretrial motions; and took the leading role in posttrial arguments. At trial, he made opening and closing arguments and handled the examination of two of the plaintiffs' six witnesses. The "Iranian attorney" provision cannot be construed to encompass the hiring of cocounsel, at an hourly rate, to handle a substantial portion of the trial as well as pretrial and posttrial proceedings.

A contingent fee should cover all routine legal work for the preparation and presentation of a case. Because Wiggins performed extensive work that needed to be done to have the matter presented for trial, his hourly fee should have been paid out of the contingent fee. To hold otherwise gives counsel the right to collect a contingent fee and then hire outside counsel, at an hourly rate, to try the case. Such calculation, at the appellant's expense, should not be sanctioned by this court. If Wiggins' services were performed by Luvera or his own personnel, admittedly there would be no additional fee on top of the contingent fee.

The fee agreement, as interpreted by the majority, authorizes a contingent fee and an hourly rate for the same work. Awarding a contingent fee in addition to an hourly fee, under the terms of the subject agreement, is unreasonable. I would hold that the trial court abused its discretion when it failed to deduct Wiggins' hourly fee from the contingent fee award.

### THE MAJORITY CONFIRMS THE PERCEPTION THAT CONTINGENT FEES ARE UNFAIR

There is already a widespread public perception that contingent fee agreements are unfair and ought to be restricted or abolished. The majority's holding today is bound to reinforce this perception.

At the request of the Legislature, this court appointed a commission to investigate possible changes in our rules governing contingent fees. In January 1986, the Senate Majority Leader and the Chair of the Senate Judiciary Committee wrote in pertinent part:

We are aware of rising public concern regarding attorney fees. The interest focuses in part on what appears to be unusually high contingency fee arrangements. Some arrangements have reportedly been as high as 55 percent of the amount of recovery. While we have no reason to believe that such alleged abuses are widespread, even isolated cases have the effect of undermining public confidence in the bar and the legal system in general.

The request by the Senators was apparently motivated by the fact that the Legislature was ready to eliminate or substantially limit the amount of contingent fees. They felt they needed a fair and independent body such as the Supreme Court to analyze all aspects of the subject. In response to this letter, the court set up a commission to study contingency fees. The Novack Commission, named after its chair, Edward J. Novack, was charged by the Supreme Court with answering the following questions:

Are there significant abuses in attorney fee practices in tort litigation, whether in the representation of plaintiffs or defendants? If so, what are the abuses, what are their causes, and what steps might be appropriate to correct them? Even if there is not a problem of significant abuses, should this court undertake further control or regulation of attorney fees and other client costs in tort litigation? What types of control or regulation might be necessary, advisable, and feasible?

Letter from Chief Justice Pearson to Edward J. Novack (Apr. 22, 1987).

This commission has now filed its report, making various recommendations, the main ones being: to base the fee on net, rather than gross recovery; to provide in advance for the resolution of fee disputes; to include appeals and collection in the services covered by the fee; and to encourage attorneys to review the fee at the termination of the lawyer/client relationship and reduce the fee if appropriate. Such proposed changes, after due deliberation by this court and after circulation in the advance sheets for lawyers' comments, will be rejected, modified or adopted as a part of the Washington Rules of Professional Conduct.

The Novack Commission's recommendations appear to be moving toward more equitable awards for the poor and injured workmen.

I cannot see how we can persuade the public of our good faith in addressing the problem of abuse of contingent fees when we fail to discuss the subject in a case directly before us. I practiced law for 29 years and found the contingent fee the one outstanding custom of our judicial system which makes our system of justice far superior to England's. Without the contingent fee, the poor and working people of America would be deprived in civil cases of the ability to process their claims and great injustices would be effectuated. However, the contingent fee should not be abused by the legal system or the public might overreact and in an attempt to rectify injustices, may in their exuberance abolish or severely limit contingent fees. Such fees should always be based on risks. A greater risk justifies a higher percentage fee. Conversely, the smaller the risk, the smaller the contingent fee should be. In the subject case, the record discloses that the client insisted on a contingent fee. The attorneys in turn responded by charging a moderate contingent fee of 25 percent of the total recovery, apparently based on the fact that liability was nearly certain, the defendant was solvent and only the size of the verdict was uncertain.

The majority states at page 153:

> There was evidence that the plaintiffs had originally agreed to pay Mr. Luvera a 33⅓ percent contingent fee. This fee was reduced to 25 percent in consideration of the fact that outside counsel might have to be appointed. The plaintiffs assert that as a result of this reduction, the Bank saved $120,000 in fees.

The record shows that the parties negotiated the amount of the contingent fee from their respective positions and it was agreed to be 25 percent subject to the "Iranian attorney" provision, which I heretofore have analyzed and rejected as to attorney Wiggins.

## The Logic and Policy Behind Contingent Fee Agreements

We cannot ignore the issue of the fairness of contingent fee agreements. I believe the subject agreement combines hourly and contingent fees in a way that undermines the basic justification for contingent fees.

There are at least four general objections to the contingent fee. The first is that it threatens the ethical integrity of the profession by encouraging a speculative attitude toward law practice, too great an emphasis on winning and the solicitation of clients. F. MacKinnon, *Contingent Fees for Legal Services* 4–5 (1964).

The second frequent objection to the contingent fee is that it encourages unnecessary litigation. In the English system, the contingent fee has always been banned, because it is considered a variety of maintenance; that is, supporting or promoting the litigation of another. Black's Law Dictionary 860 (5th ed. 1979). The prohibition on maintenance was the result of a variety of influences, but one of the primary causes was clerical opposition to the "vice" of litigation. Radin, *Maintenance by Champerty*, 24 Calif. L. Rev. 48, 66, 68 (1935). Litigation is still considered a necessary evil in Britain, and is still discouraged there in part by the prohibition on contingent fees. Minish, *The Contingent Fee: A Re–examinae*, 10 Manitoba L.J. 65, 71 (1979).[1] Even in this country, where the attitude toward litigation is more positive, contingent fees are often blamed for nuisance lawsuits and the promotion of a litigious atmosphere. F. MacKinnon, at 5.

The third fundamental objection to the contingent fee is that there is no logical relationship between the time and

---

[1]Another reason the fee is not permitted is that the services of a barrister are considered a "noble" act. Payment to a barrister is therefore considered "an honorarium which he may accept as a gesture of his client's gratitude but for which he has no claim." F. MacKinnon, *Contingent Fees for Legal Services* 10 (1964). Contracting for a portion of the recovery is doubly inconsistent with the notion of an honorarium for a "noble act".

effort devoted to a case and the compensation received.[2] One effect of this is to raise the possibility of disproportionate fees. In *People v. Nutt*, 696 P.2d 242 (Colo. 1984) for example, an attorney was suspended for 6 months because he received a "clearly excessive fee." The services rendered in a suit for oil and gas royalties had a value of $18,272.78. The fee arrangement, however, would have permitted the attorney to receive up to $200,000. *See also In re Swartz*, 141 Ariz. 266, 686 P.2d 1236 (1984). Even where the fee is not grossly disproportionate, it is arguable that, as a general rule, contingent fees overvalue lawyer services. *See* F. MacKinnon, at 159–94.

The fourth basic objection to contingent fees is related to the third. Severing the logical tie between compensation and services rendered means that the client and the attorney are placed in a conflict of economic interest. The attorney will tend to spend as little time as possible on the case, so that he will maximize his hourly compensation. The client, on the other hand, will want the attorney to spend as much time as possible on the case, so as to avoid paying a disproportionately high cost for legal services. Clermont & Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529, 534–66 (1978).

Despite these claimed flaws, contingent fees are extensively used throughout the United States.[3] The most important justification for the contingent fee is that it opens up the legal system to those who could not otherwise afford it.

> The justness of his cause, and not the ready availability of means to prosecute that cause, should be the test of whether a person pursues the remedial action which the law provides. Life for the average person in our modern

---

[2]Except, of course, in the all–or–nothing sense that the lawyer will not be paid unless he wins.

[3]Most western states never prohibited contingent fees. The last state to authorize them was Maine, in the mid–1960's. Comment, *Contingent Percentage Fees: An Economic Analysis*, 51 J. Air L. & Com. 531, 535 (1986).

society is a risky, complicated, and expensive business. It is equally clear that the law, as it always has, reflects the complexity of the society it serves. The new and added risks of injury or wrong to which the citizen is exposed have led to the creation of whole new bodies of law, and the reach of earlier laws has been extended to afford him redress under changed conditions.

All of this response of the law to new and changed conditions would be without meaning unless there were also provided sensible access for the average person to the processes of the law.

Hughes, *The Contingent Fee Contract in Massachusetts*, 43 B.U. L. Rev. 1, 7–8 (1963).

The contingent fee is important to the profession, because it is an essential part of its economic viability.

It should be noted at the outset that the contingent fee is the dominant system in the United States by which legal services are financed by those seeking to assert a claim.

F. MacKinnon, at 4 and 114–40 (statistics on the fee's economic importance to the profession).[4]

---

[4] Beyond these two justifications, it is important to note some responses to the general objections to the contingent fee listed above. First, it is impossible to say how often ethical violations can be directly attributed to the use of contingent fees. Even if they do occur, those violations are and should be addressed directly by the courts and bar associations of the country. Abolishing the fee would be an overbroad solution to ethical problems that are difficult to gauge at all. This also holds true for any harm that results from the conflict of economic interests between lawyer and client.

Second, it is equally difficult to say whether the use of contingent fees actually leads to an increase in unnecessary litigation. In all likelihood, it does not. Given the investment and risk required of the attorney, he or she certainly will not want to pursue patently frivolous claims. F. MacKinnon, at 201. From the plaintiff's point of view, if it is true that he will pay more for legal services under a contingent fee arrangement than he would on an hourly basis, it is likely the fee will be used only in those cases where it is really necessary; that is, where the plaintiff has no other access to the legal system.

Third, while it may be true that, all things being equal, compensation is higher under contingent fees than on an hourly basis, this is not necessarily unfair or disproportionate. For one thing, the plaintiff who agrees to a contingent fee shifts the risk of pursuing the lawsuit from himself to his attorney. The attorney is properly compensated for taking on this risk, over and above what he earns for his skill and effort. In addition, there is a sense in which the attorney is lending

It is now being seriously discussed that we combine contingent and hourly fees in a single agreement on compensation. In fact, the leading proposal for reform of contingent fee practices relies on such a combination. Cornell's Professor Clermont and a colleague have proposed a contingent hourly–percentage fee, calculated as the sum of (1) the attorney's hourly rate times the number of hours worked and (2) a percentage of the amount by which the gross recovery exceeds that time charge. As the authors point out:

> This contingent hourly–percentage fee largely solves the problem of economic conflict of interest between lawyer and client, a problem that exists under both the certain hourly fee and the contingent percentage fee. It also solves or minimizes many of the other problems associated with these two basic fee systems. Because of its contingency, the proposed fee facilitates access by the poor to legal services. Moreover, it measures well the cost to the lawyer and the value to the client of the legal services rendered—certainly better than does either a pure hourly fee or a pure percentage fee.

Clermont & Currivan, at 598.

The combination of hourly and contingent fees in the agreement at issue here only exacerbates the argument against the contingent fee. The most obvious flaw, and the one which has created the problem, is the potential for excessive recovery. In ordinary contingent fee contracts, this tendency can be justified by the fact that risk is shifted to the attorney and by the fact that he lends his services and can plausibly claim interest. A combination of hourly and contingent fees like the Clermont and Currivan proposal can eliminate the problem. In this agreement, however, the combination of hourly and contingent compensation makes the problem worse. To the extent the client bears the legal fees directly, he continues to bear the risk of pursuing the litigation. To the same extent, the

---

something of value—his services—to the client. The "excess" fee is therefore justifiable partly as interest on this loan. 51 J. Air L. & Com., at 538–40.

attorney is no longer advancing services and there is no interest theory justification for an excessive contingent fee payment. This combined contingent/hourly contract, in other words, undercuts the justification for the contingent fee. The only way to combine hourly and contingent fees so as to avoid this effect is to offset the hourly fee against the contingent fee. This agreement, as the majority interprets it, fails to make that critical adjustment. The result is that the hourly fee in this agreement destroys one of the contingent fee's major attractions.[5]

This agreement, as the majority interprets it, also intensifies the conflict of economic interests between the attorney and the client. The subject agreement not only encourages the attorney to spend as little time as possible on the case, it makes it legally possible to shift work to a second attorney. Since the first attorney's work load is reduced while his contingent fee compensation is not reduced at all, he will send as much work as possible to the second attorney. The client, meanwhile, not only pays the relatively high contingent fee, he pays an hourly fee for work that should have been covered by the contingent fee and the client necessarily does not receive the services he contracted for, because they are performed by a different attorney.

This is *exactly* what happened here. The majority, however, fails to recognize this conflict of interest.

Given that this fee agreement was flawed, it cannot constitute a reasonable basis for the award of fees under RCW 4.84.020. The way to cure the defects of the subject agreement would be to offset the hourly fees against the contingent fee. The trial court failed to do so, and therefore abused its discretion.

---

[5] It makes no difference, from the client's point of view, whether the hourly payments go to the first attorney the client hires or a second attorney who associates with the first. An excessive payment to one or two attorneys is still excessive.

CONCLUSION

The plaintiffs' attorneys are men of integrity and ability and have every right to test the validity of their "Iranian attorney" provision of their contingent fee agreement, but members of the Supreme Court also have a responsibility to set forth their views for the benefit of the public. The majority in this opinion by validating a contingent fee plus an additional fee for legal work done by secondary attorneys will create gargantuan attorney fees that clients cannot afford, and which ultimately will injure the legal profession. The subject contingent fee agreement should not be used as the basis for the award under RCW 4.84.020 unless the hourly compensation award was offset against the contingent fee. I would disallow Wiggins' fees in the amount of $80,000 and affirm the contingent fee judgment in the amount of $596,646. As the appellant is the prevailing party, I would remand to the trial court for determination of a reasonable attorney fee for appellant for this appeal.

After modification, further reconsideration denied May 26, 1989.